The bill seeks, inter alia, to hold directors of the Bethlehem Steel Corporation accountable for abuse of the company's bonus system, in paying exorbitant bonus to executives and heads of departments. The executives are directors of the company.
The bonus system is not impugned; the attack is upon its administration. The inequity of the bonus, not of its distribution, is the gravamen of the bill. The policy of stimulating effort, efficiency and accomplishment by extra compensation is as old as the company itself. From the beginning in 1905 to 1917, the board of directors sanctioned the bonus and in that year the stockholders approved the system and resolved that three and forty-three hundredths per cent. of the annual net earnings and on a sliding scale upwards, as the earnings increased, to eight per cent. be set aside for *Page 149 
bonus to the executives and heads of departments as a group. The net annual earnings were to be found after interest charges and dividends on preferred stock, but before allowances for depreciation. In the following year the stockholders, by by-law, authorized the board of directors to allocate the bonus among the officials or to delegate the function to its chairman or a committee and empowered the board to change or modify the system, but not to increase the bonus beyond eight per cent. Since then, the allocation has been made by the chairman among the group of officials upon a sustained ratio basis, with a single exception. The share of the chief executive in one of the years, 1929, was $1,623,753. The aggregate of the bonus for the past seventeen years exceeded $25,000,000. The bill challenges these disbursements as grossly excessive compensation and as an unconscionable enrichment of the executives at the expense of the stockholders.
It is the claim of the complainants:
(a) That though the stockholders fixed the percentage of earnings as bonus to the executives group, it became the duty of the board of directors, composed mainly of the executives, whenever the bonus became excessive, to modify it to a basis of reasonable compensation to the officials, as the by-laws authorized and as they were in conscience bound to do.
(b) That the bonus, intended as a spur to group effort, was calculated inclusive of income derived through expansion by merger and by purchase of other large income-producing concerns, regardless of group efficiency and to a degree so manifestly out of proportion to reasonable compensation for individual service or reward for group achievement as to amount to fraud on the common stockholders, who, for the years 1925, 1926, 1927 and 1928 received no dividend, while the executives' bonus approximated $7,000,000.
(c) That in some years the bonus exceeded the limit of eight per cent. of the net income; and that throughout, the bonus exceeded the stipulated percentage of the net annual income. These claims rest on the failure to make allowances for depletion and obsolescence in determining income. It was to be determined before allowances for depreciation, and the *Page 150 
contention is that depreciation does not include loss of assets through destruction or abandonment.
(d) That the bonus was compounded, computed on income from income which should have been paid to common stockholders as dividends.
Favoritism in parceling out the bonus is also asserted, but that concerns only those who suffered by the discrimination.
For these and other reasons the cestuis que trustent, the stockholders, ask their trustees, the board of directors, to account for their stewardship; to inform them — and to justify their basis in determining the bonus and its distribution and to make good any deficiency — information which has been withheld from them, avowedly "for the good of the service." The administration of the bonus system has been sedulously suppressed from the stockholders, the result only coming to their notice recently
The company alone answers. The directors, all non-residents, have not submitted to this jurisdiction.
In the face of the bill, the board of directors have proposed to the stockholders that at their annual meeting to be held in Newark, Tuesday, April 14th instant, they ratify the board's administration of the bonus system, and to that end have circularized the eighty thousand of them, all over the globe, soliciting their proxies to vote affirmatively on the resolution; announcing that at the meeting the chairman will submit for their approval his administration since 1917.
Handicapped by a two weeks' lead, the complainants, on March 20th, also circularized the stockholders for their proxies to vote disapproval of the resolution; quickly and on the heels of this followed another circular from the chairman enclosing a duplicate proxy, suggesting possible confusion from the two sets of proxies, and that they sign, if they have not already done so or by inadvertence had signed the complainants' proxy, and to date the proxy, as that was important.
The complainants now move to enjoin the adoption of the resolution upon the ground that if by this resolution the majority purpose to bind the minority and thereby foreclose *Page 151 
the complainants of relief, it can be done only after the body of stockholders are informed of the issues; that they are not informed and consequently there cannot be an intelligent vote upon the question. If that be the legal effect of the resolution, the objection is well taken for:
Those of the eighty thousand stockholders who have given proxies to the directors, signed with notice only of the chairman's allocation of the bonus to the various executives — the amounts to each and the years, and no more. They signed on the faith of the management, and without knowledge of the real things at stake in this suit. The informing circular letter to them, giving the beneficial results to the executives, is barren of explanation of the integrity of the bonus and of the charges of which its integrity stands challenged in the particulars adverted to.
It will be a battle of proxies, not of wits. It is a foregone conclusion that if the management has a majority, the resolution will be passed regardless of the chairman's explanation, for the management proxy holders have no discretion — their proxies read to vote approval only. Explanation will be idle, frivolous, falling upon ears not allowed to hear and minds not permitted to judge; upon automatons, whose principals are uninformed of their own injury, if the charges of the bill be well founded, and incapable of appraising the rights of their fellow stockholders, or to bind them by the majority rule. See General InvestmentCo. v. American Hide and Leather Co., 97 N.J. Eq. 214, 230.
The motion is not premature. The rule laid down in Grausman
v. Porto Rican-American Tobacco Co., 95 N.J. Eq. 223, is inapplicable. The circumstances are different. It would be stupid indeed to assume that the eighty thousand shareholders may possibly attend the meeting in person to hear the chairman account for his administration before voting, and thus remove the vice of the proxy vote. It would require "Boyle's Thirty Acres" to accommodate them.
What the defendants expect to gain by the resolution is not apparent. Probative value of an overwhelming affirmative vote, as in Berger v. United States Steel Corp., 63 N.J. Eq. *Page 152 809, and Bingham v. Savings Investment and Trust Co.,102 N.J. Eq. 302, would not avail them, for the vote could have no influence upon the right to relief of even a single shareholder who suffered injury by unlawful conduct. Obviously the resolution of a majority cannot force a complaining minority into suppression of their rights nor find in it immunity, or by means of it frustrate redress for injury.
The defendants' attitude is that the resolution will either defeat the complainants' right to relief or obstruct their remedy or in some manner add complications; which, or how, is not made clear, but undoubtedly they hope for some advantage that threatens the rights of the complainants to their injury. On the other hand, the complainants rest in confidence on what was said by Vice-Chancellor Emery in Lillard v. Oil, Paint and DrugCo., 70 N.J. Eq. 197, and in the affirmed opinion in Booth v.Beattie, 95 N.J. Eq. 776, but, nevertheless, they are apprehensive because of the court of errors and appeals opinion in U.S. Steel Corp. v. Hodge, 64 N.J. Eq. 807, to the effect that a ratification by a mapority of the stockholders validates an otherwise voidable contract of the company. Of course, apprehension alone is not sufficient to move the court (GermanEvangelical Lutheran Church, c., v. Maschop, 10 N.J. Eq. 57), but when apprehension is stirred by threatened oppression, appeal to equity is the appropriate recourse, and upon the case as made the court ought, and may with propriety interfere to prevent the perpetration of the colorable resolution as a shield or screen from responsibility for the charges laid in the bill. Whether the defendants will eventually be entitled to the benefit of the resolution and the advantages that may flow from it will be reserved until the case is unfolded at the final hearing and in the meantime there will be an injunction restraining corporate adoption of the resolution, with permission to cast but not to announce or record the vote unless and until permission is given. *Page 153