ROGERS *v.* GUARANTY TRUST COMPANY OF
NEW YORK ET. AL.

No. 227.   Argued December 15, 16, 1932.—Decided January 23, 1933.

124

*Mr. Richard Reid Rogers* pro se. *Mr. Evan Shelby* was on the brief.

*Mr. John W. Davis,* with whom *Mr. Nathan L. Miller* was on the brief, for respondents.

MR. JUSTICE BUTLER delivered the opinion of the Court.

Petitioner, plaintiff below, owns 200 shares of the common stock of The American Tobacco Company which he acquired prior to the passage of c. 175, New Jersey Laws, 1920, that is here involved.* He also owns 400 shares of common stock B. He brought two suits in the supreme court of New York: one against the tobacco company and some of its directors, the other against the trust company, Junius Parker and others. On application of defendants both were removed to the federal court for the southern district of that State. The first was discontinued as to some defendants and the cases were consolidated. The defendants before the court are the two companies, Parker, and five of the 17 directors of the tobacco company including its president, one of its vice presidents and its secretary.

The tobacco company was organized under the laws of New Jersey, and in that State maintains its " principal

and registered office " as designated in its charter, holds the stockholders' meetings and does a substantial amount of business. · It is authorized by the laws of New York to do business there and has in New York City its principal place of business where its directors usually meet, its executives have their offices and most of its records are kept. It carries on business in that and many other States and also in a number of foreign countries.

The grievances alleged by plaintiff concern the issue, allotment and sale of stock of the tobacco company. June 25, 1930, the board of directors adopted a resolution recommending the reduction by one-half of the par value and the doubling of the number of shares of its common stock and common stock B. It had outstanding 526,997 shares of preferred stock, and, as a result of action in accordance with that recommendation, 1,609,696 shares of common and 3,077,320 shares of common B. And by another resolution the board advised approval by the stockholders of a plan for the issue and sale of common stock B to employees pursuant to c. 175, New Jersey Laws, 1920.[1] The plan submitted accords to such em-

---

[1] Section 1 of that Act provides for the participation of employees in purchase of stock, profits, welfare work and management of any corporation organized under the laws of the State, and declares: "Any stock corporation . . . may, upon such terms and conditions as may be determined in the manner hereinafter designated, provide and carry out a plan or plans for any or all of the following purposes: (a) The issue or the purchase and sale of its capital stock to any or all of its employees and those actively engaged in the conduct of its business or to trustees on their behalf, and the payment for such stock in installments or at one time with or without the right to vote thereon pending payment therefor in full, and for aiding any such employees and said other persons in paying for such stock by contributions, compensation for services, or otherwise." And § 2 (b) provides: ". . . the board of directors shall first formulate such plan or plans and pass a resolution declaring that in its opinion the adoption thereof is advisable, and shall call a meeting of the stockholders to take

ployees and others actively engaged in the conduct of the business as may be selected an opportunity to purchase stock "by way of additional compensation for services to be rendered," and allots for subscription shares of unissued stock. The board may offer stock to such persons in the service at prices not less than par and upon other terms and conditions determined by the president pursuant to authority granted him for that purpose by the board. No employee or person actively engaged in the conduct of the business of the corporation or its subsidiaries shall be deemed ineligible to its benefits by reason of being also a director of the corporation or of any of its subsidiaries or of holding any office therein.

On July 28, 1930, the stockholders adopted the plan. And January 28, 1931, the board authorized a sale of 56,712 shares of common stock B at par value of $25 per share. It directed that there be furnished to the president, to be considered in determining to whom the stock should be allotted for purchase, a list showing the services rendered and, having regard to the value of the same, the rating on a percentage basis given to each together with the total amount of his compensation for 1930. It recommended that the basis of distribution should be the number of shares having par value equal to one-third of that year's compensation to each allottee rated at 100 per cent. and correspondingly less to those having lower ratings. And there was accorded to each of 535 employees, including directors and others active in the business, the right to subscribe for the new stock on that basis. All

action thereon. . . . If two-thirds in interest of each class of stockholders present at said meeting and voting shall vote in favor of any such plan or any modification thereof, the said plan shall thereupon become operative." And that section gives to any dissenting stockholder the right upon surrender to receive from the company the appraised value of any stock that was acquired before the passage of the Act.

the shares allotted were sold at $25 for cash to the trust company. The trust company allowed each allottee to subscribe at the same price. At that time it was worth $112. The agreement stated that this was by way of additional compensation for service to be rendered between January 31 and December 31, 1931, that until the end of the year no allottee could take up his stock, that he was entitled to have dividends applied on the purchase price and that if he should terminate his employment before the end of the year the trustees were to decide whether he should have his allotment.

The complaint attacked the transaction upon the following grounds: The directors being disqualified by reason of their interest as allottees, the plan was not passed by a valid vote or adopted as required by c. 175. The subsequent vote of the stockholders required by the statute to be predicated upon action by the board, was likewise invalid. The plan was *ultra vires* in that the allotment " by way of additional compensation for services to be rendered " violated c. 195, New Jersey Laws, 1917. Under the company's charter and the statutes of New Jersey— § 224, General Corporation Law as added by § 16 of c. 318, Laws 1926—every stockholder had the right according to the number of his shares to have pro rata distribution of the stock in question. And the complaint prayed decree that the defendants be enjoined from carrying out the plan, that the stock be declared void and canceled, and that the defendants, other than the tobacco company, be held for costs and damages sustained by that company.

Four defenses were set up: Plaintiff failed to comply with Equity Rule 27. The stockholders including plaintiff ratified the allotments to the directors. The suit is an attempt to regulate the internal affairs of a corporation foreign to New York, and the United States district court sitting therein should decline to take jurisdiction. The

allotments were fair and reasonable and were made in accordance with the company's by-laws and the statutes of New Jersey. Plaintiff moved for an order striking out the defenses as insufficient and for a decree in accordance with the prayer of the complaint. or, in the alternative, for an injunction *pendente lite* preventing the carrying out of the plan.

The district court filed an opinion [60 F. (2d) 106] in which it said:

. . " In the present case, the validity of the shares sought to be cancelled depends primarily upon the interpretation and effect of the act of 1920. The directors cited this statute as their authority for the plan when they formulated it and have all along insisted that the plan is in conformity with the statute. The plaintiff takes the position that the statute is not applicable and has been used by the directors merely as a cover for a raid upon the corporate treasury for their own profit. In addition, plaintiff submits that two other statutes, that of 1917 and that of 1926, must be taken as limiting the operation of the 1920 act. It is obvious that the case presents not merely questions of fact but questions of some complexity under the New Jersey laws. There seem to be no decisions of the New Jersey courts to serve as a guide in the proper construction and possible interrelation of these statutes. The legality of the corporate proceedings which resulted in the issuance of this stock is peculiarly a matter for determination in the first instance by the New Jersey courts. It may be noted that the American Tobacco Company is not, a local enterprise. While its chief office is said to be here and it unquestionably carries on business here, its activities are known to be world-wide. It has a New Jersey charter; it refers to the New Jersey office as its principal office; it holds its stockholders' meetings there. It is not a resident corporation in any sense of the word."

And it entered judgment denying the motion and that " in the exercise of this Court's discretion, each of the bills of complaint herein be and the same are hereby dismissed, without prejudice to the enforcement of the rights of plaintiff, if any, in the courts of New Jersey."

The Circuit Court of Appeals, 60 F. (2d) 114, dealing with plaintiff's contentions before it, held that the plan was authorized, that the stock was, lawfully issued under New Jersey statutes, and that for the reasons given in the opinion the bill was properly dismissed. A dissenting opinion suggests that the plan was not sufficiently in detail to comply with the New Jersey statute. The court affirmed the judgment appealed from, and upon its mandate the district court entered a decree that the bills of complaint be dismissed with costs.

Among the points and contentions raised and pressed by plaintiff in his petition for certiorari and argument here are the following: The plan is not definite and formulated as required by c. 175. That chapter as construed below is repugnant to the contract clause of the federal Constitution. The decision that the plaintiff failed to comply with Equity Rule 27 is contrary to c. 175. Chapter 195, New Jersey Laws 1917, does not permit the issue of stock to employees for services to be rendered. The decree of the district court declining to exercise jurisdiction is contrary to decisions of this court and in conflict with the decision of the Circuit Court of Appeals for the Seventh Circuit in *Williamson* v. *Missouri-Kansas Pipe Line Co.*, 56 F. (2d) 503.

The authorization, allotment and sale of the shares in question involved the proportionate ownership of stockholders and their rights *inter sese*. Unquestionably the steps taken and proposed to formulate and carry out the plan constitute the conduct and management of the internal affairs of the tobacco company. The controversy is solely between the plaintiff and other stockholders not

participating in the distribution on one side and the purchasers of the new stock, the corporation, its directors and officers on the other. When, by acquisition of his stock, plaintiff became a member of the corporation, he, like every other shareholder, impliedly agreed that in respect of its internal affairs the company was to be governed by the laws of the State in which it was organized. His rights, whatever the tribunal chosen for their vindication, are to be determined upon the ascertainment and proper application of New Jersey law.

It has long been settled doctrine that a court—state or federal—sitting in one State will as a general rule decline to interfere with or control by injunction or otherwise the management of the internal affairs of a corporation organized under the laws of another State but will leave controversies as to such matters to the courts of the State of the domicile. *Wallace* v. *Motor Products Corp.*, 25 F (2d) 655, 658. *Chicago Title & Trust Co.* v. *Newman*, 187 Fed. 573, 576. *Eberhard* v. *Northwestern Mutual Life Ins. Co.*, 210 Fed. 520, 522. *Powell* v. *United Association*, 240 N. Y. 616; 148 N. E. 728. *Sauerbrunn* v. *Hartford Life Ins. Co.*, 220 N. Y. 363, 371; 115 N. E. 1001. *Jackson* v. *Hooper*, 76 N. J. Eq. 592, 604; 75 Atl. 568. *Guilford* v. *Western Union Telegraph Co.*, 59 Minn. 332, 340; 61 N. W. 324. *Kimball* v. *St. Louis & S. F. Ry. Co.*, 157 Mass. 7; 31 N. E. 697. *Hogue* v. *American Steel Foundries*, 247 Pa. 12, 15; 92 Atl. 1073. *Babcock* v. *Farwell*, 245 Ill. 14, 33, *et seq.*; 91 N. E. 683. *Clark* v. *Life Association*, 14 App. D. C. 154, 179–180. *North State Copper & Gold Mining Co.* v. *Field*, 64 Md. 151; 20 Atl. 1039. Cf. *Burnrite Coal Co.* v. *Riggs*, 274 U. S. 208, 212–213. While the district court had jurisdiction to adjudge the rights of the parties, it does not follow that it was bound to exert that power. *Canada Malting Co.* v. *Paterson Co.*, 285 U. S. 413, 422 and authorities cited. It was free in the

exercise of a sound discretion to decline to pass upon the merits of the controversy and to relegate plaintiff to an appropriate forum. *Langnes* v. *Green,* 282 U. S. 531, 535, 541. *Heine* v. *New York Life Ins. Co.,* 50 F. (2d) 382. Obviously no definite rule of general application can be formulated by which it may be determined under what circumstances a court will assume jurisdiction of stockholders' suits relating to the conduct of. internal affairs of foreign corporations. But it safely may be said that jurisdiction will be declined whenever considerations of convenience, efficiency and justice point to the courts of the State of the domicile as appropriate tribunals for the determination of the particular case. *Cohn* v. *Mishkoff Costello Co.,* 256 N. Y. 102, 105; 175 N. E. 529. *Travis* v. *Knox Terpezone Co.,* 215 N. Y. 259, 263; 109 N. E. 250. *Kimball* v. *St. Louis & S. F. Ry. Co., supra.*

The complaint shows that as of its date seven directors of the tobacco company were not residents of New York. Only six allottees are before the court. The others, over 525, are not mentioned in the complaint. It appears from the answer that many of them are outside New York, and it may be inferred that a large number of them reside in the other States and countries in which the company does business. At the time, February 23, 1932, of the dismissal of the bill the services of the employees, for which the allotments constitute part compensation, had been fully performed and they were entitled to have and presumably they, or at least some of them, had secured the delivery of the shares so allotted to them. As the tobacco company, in addition to its registered office, has property, operates directly or through subsidiaries branch factories in New Jersey and carries on business there and in other States and countries, it may not be deemed to have been organized in that State as a mere matter of convenience for the purpose of carrying on all its business in another State

or be deemed in New York to be a local concern. This case is wholly unlike *Williamson* v. *Missouri-Kansas Pipe Line Co., supra,* relied on by plaintiff.

The determination of plaintiff's contentions requires not only the ascertainment of the true meaning and intent of c. 175 of New Jersey Laws, 1920, but also its constitutional validity. Its provisions have never been construed by the New Jersey courts and they or their like are not familiar in the statute law governing corporations organized in other States. And other New Jersey statutes among which are c. 195, Laws of 1917, and c. 318, § 16, Laws of 1926, are claimed by plaintiff to have an important bearing upon this case. But the courts of that State have had no occasion to consider the interrelation, if any, between them and c. 175 pursuant to which the stock in question purports to have been issued to employees. A mere inspection of the New Jersey statutes directly involved suggests grave doubts as to their proper application to the facts in this case and the difference of opinion expressed below confirms that impression.

So far as concerns the cancellation of the allotted shares, and other relief sought by plaintiff, the situs of the stock is in New Jersey and all questions relating to the validity of the plan, authorization, issue, allotment and sale of the same may be conveniently and effectively determined in New Jersey courts, the authoritative and final interpreters of the statutes of that State. A proceeding *in rem* is authorized, process therein may be served by publication and a decree, final and binding upon all, canceling or sustaining the stock may readily be enforced. New Jersey Practice Act of 1903, § 84. *Jellenik* v. *Huron Copper Co.,* 177 U. S. 1, 13. *Andrews* v. *Guayaquil & Quito Ry. Co.,* 69 N. J. Eq. 211; 60 Atl. 568. *Holmes* v. *Camp,* 219 N. Y. 359; 114 N. E. 841. The facts and circumstances disclosed by the record clearly bring this case within the general rule and abundantly justify the exer-

cise of discretion on the part of the district court in dismissing the bills of complaint without prejudice. As the Circuit Court of Appeals considered and decided the merits of the case, its judgment is reversed, the judgment of the district court entered upon its mandate is vacated and the case will be remanded to the district court with directions to reinstate the earlier judgment dismissing the bills of complaint without prejudice.

*Reversed.*

MR. JUSTICE ROBERTS took no part in the consideration or decision of this case.

MR. JUSTICE STONE, dissenting.

I think the Court should decide this case on its merits in favor of the petitioner.

Respondent, the American Tobacco Company, organized under the laws of New Jersey, is a large and prosperous corporation, engaged in the manufacture and distribution of cigarettes and other forms of tobacco. It has upwards of 40,000 stockholders. At the commencement of this suit it had a board of 16 directors, including a president, five vice presidents, a secretary and a treasurer, all actively engaged in its management. For many years these officers have received large annual fixed salaries, as well as large annual cash profit-sharing bonuses paid under a by-law of the company, adopted in 1912. See *Rogers* v. *Hill,* 60 F. (2d) 109. In the year 1930, the profit-sharing bonus of the president, added to his fixed salary of $168,-000, gave him a total compensation of over $1,010,000, which was further augmented by a special " credit " of $273,470. In the same year, four of the five vice presidents received an aggregate annual salary and bonus of more than $2,077,000. In addition, a number of stock subscription plans have from time to time been put into operation by the directors, without authority of the charter or by-laws of the corporation, or the knowledge or ap-

proval of its stockholders, by which they largely benefited.
In that of 1926, the respondent Hill, the president and
also a director of the company, acquired 8,000 shares of
common stock, and other directors, who are respondents
here, received substantial amounts. In that of 1929, one
year before the transactions now complained of, 46,500 of
51,750 shares of common stock, purchased by the corpo-
ration and set aside for the purpose, were sold to the cor-
porate directors at $47 per share less than market value.
Convenient arrangements were made for postponed pay-
ment of the purchase price. Respondents received 23,050
shares, of which the president received 15,050.

On January 28, 1931, a new allotment of stock was made,
which is the subject of this litigation. On that day, the
Board of Directors (the president and officers constitut-
ing a majority of those in attendance) considered and
passed upon the adequacy of the compensation which its
members were then receiving for their services to the cor-
poration, and the necessity of conferring further benefits
on themselves in order to insure the continuance of those
services. Having resolved these questions in their own
favor, they proceeded to award additional benefits in the
form of the privilege to subscribe to unissued common
stock B of the corporation, at a small fraction of its mar-
ket value. By resolution of that date, they put into effect
a stock subscription plan by which 56,712 shares of un-
issued common stock B of the corporation were distributed
in accordance with recommendations made by the presi-
dent. Of this number 32,370, more than half, were allotted
to the directors; of which 13,440 were allotted to the presi-
dent. The remaining 24,342 shares were allotted 1 rela-
tively small amounts to 525 employees. None of the
recipients was of lower rank than factory subassistant.
Four hundred and seventy-three received allotments of
less than 100 shares each, the great majority receiving
from 15 to 50 shares. The stated consideration for issue

of the stock was a subscription price of $25 per share, the par value, and the services of the allottee, not specifically described, to be rendered to the American Tobacco Company for the remainder of the year.

The certificates of stock were to be delivered to the respondents, the Guaranty Trust Company of New York and an individual, as trustees. They were authorized to borrow money upon them to the extent of $25 per share, in order to effect immediate payment of the subscription price to the Tobacco Company, to apply dividends received on account of the purchase price to be paid by the allottees and to deliver the certificates to them after the close of the year, upon payment in full of their subscriptions. They were given discretion to waive performance of the stipulated service by any allottee and in the event that the subscriber was discharged or resigned from the employ of the company within the year, to cancel the subscription agreement or not, as they pleased.

On the day of the resolution allotting the stock, its market price was $112 per share, more than four times the subscription price. It was then paying, and has ever since paid, dividends at the rate of $5 per year, sufficient to pay the subscription price in five years. Valuing the subscription privilege by the difference between the subscription price and the market value of the shares, the president received by the allotment the equivalent of $1,169,280, in addition to his annual compensation of more than $1,000,000. The stock subscription rights awarded the five vice-presidents, similarly valued, amounted to $1,451,595. That the subscription privilege, accorded for the avowed purpose of assuring the continuance of these executives in the company's employ, was then and has been ever since of great value, upon any theory of valuation, is not questioned.

Conceiving himself aggrieved by this transaction, petitioner, a non-assenting stockholder, brought two suits in

the Supreme Court of New York, the state in which he resides, joining as defendants the American Tobacco Company, the trustees of the allotted stock, and certain of the directors, including the president, secretary, treasurer and five vice presidents, one of whom has since died and two of whom were not served with process. Included in the relief sought was a decree that the corporation, its officers and directors be enjoined from carrying out the stock allotments and that the stock allotted to the directors be surrendered to the Company. On motion of defendants, the Tobacco Company and a non-resident director, the causes were removed to the District Court for Southern New York, on grounds of diversity of citizenship of the parties to a separable controversy, and there consolidated.

Thus called upon in this suit to account for their stewardship and to justify their action, the defendants, the respondents here, place their whole reliance upon a statute of New Jersey in conformity with which, they contend, they secured, in advance, the authorization of the stockholders to make the challenged allotments of stock.

Section 1, c. 175, of the New Jersey Laws for 1920, authorizes any New Jersey corporation to provide and carry out a plan for "(a) the issue or the purchase and sale of its capital stock to any or all of its employees and those actively engaged in the conduct of its business or to trustees on their behalf . . . and for aiding any such employees or said other persons in paying for such stock by contribution, compensation for services or otherwise, . . ." Section 2 (b) provides that where, as in this case, the corporation has been formed without charter or by-law provisions authorizing the issuance or the purchase and sale of stock for such purposes, " the board of directors shall first formulate such plan or plans and pass a resolution declaring that in its opinion the adoption thereof is advisable and shall call a meeting of the stockholders to

take action thereon . . ." It requires an affirmative vote of two-thirds in interest of each class of stockholders, present at the meeting, for the adoption of the plan.

In June, 1930, the directors, purporting to act under this statute, presented to the stockholders, by notice of a special meeting, a so-called "plan" under which the employees of the corporation and those actively engaged in its business were to be permitted to subscribe to unissued shares of its common stock B. The notice of the meeting was accompanied by a document designated "Employees' Stock Subscription Plan," and by a copy of resolutions of the board of directors authorizing the submission of the plan to the stockholders, proposing a reduction in the par value of the common stock and the non-voting common stock B from $50 to $25 per share, and an increase of the authorized common stock from 1,000,000 to 2,000,000 shares, and of the authorized common stock B from 2,000,000 to 4,000,000 shares, each stockholder to receive two shares of the new stock for one of the old. By thus increasing the authorized, unissued shares of common B, stock was to be made available for subscription by employees.

The Employees' Stock Subscription Plan proposed " to allot for subscription . . . by way of additional compensation for services to be rendered, shares of unissued common stock B . . . to such employees of the corporation and/or its subsidiaries and those actively engaged in the conduct of its or their business as may be selected . . ." The prescribed method of execution of the plan was that " the Board of Directors may, at such time or times as it may determine . . . offer and allot such stock for subscription . . . in such amounts and proportions, to such persons, at such prices, not less than the par value of the shares allotted, payable in full or in such installments, and upon such other terms and conditions, all as shall be determined with respect to each offering of

stock to each individual pursuant to authority to be granted by the Board of Directors to the President for such purpose."

Accompanying the notice of the meeting was a circular letter by the president to stockholders, in which they were told of the prosperous condition of the company, that the 'purpose of the stock allotment plan was to encourage those who had made the company's success possible to continue in its employ, and that it was the expectation of the Board of Directors, if the program set forth in the notice of the meeting and accompanying documents should be approved by stockholders, to declare an extra dividend of $4 per share on the common stock and common stock B, and to initiate regular quarterly dividends on the newly authorized shares of common stock and common stock B at the increased annual rate of $5 per share. The letter closed with a request to sign and return the enclosed proxy, thereby indicating "your approval of the proposed steps and your support of your Company's management."

Moved, perhaps, by these inducements, the proposal was approved at the meeting by vote of the requisite number of shares of each class.

No disclosure was made to the stockholders by the officers and directors of the stock subscription plans previously put into operation by them, without authority of the charter or by-laws or the knowledge and approval of the stockholders. No disclosure was made of the number or amounts of the annual cash bonuses which had been paid to the president and vice presidents of the company, under the by-law adopted in 1912, and never, so far as appears, subsequently mentioned to the stockholders until after the stock allotments here involved. The only hint of the intention of the management to participate in the proposed Employees' Stock Subscription Plan was contained in a single sentence appearing in the Plan:

" No employee, or person actively engaged in the conduct of the business of the Corporation, or its subsidiaries, shall be deemed ineligible to the benefits of the Plan by reason of being also a director of the Corporation or of any of its subsidiaries or of holding any office therein."

With all these facts presented by the pleadings, the district court, acknowledging its jurisdiction both as a federal court and a court of equity to decide the cause on its merits, nevertheless, held that as the suit concerns the internal affairs of a New Jersey corporation, discretion should be exercised to dismiss it without prejudice to its maintenance in the courts of New Jersey. On appeal, the Circuit Court of Appeals for the Second Circuit, Judge Swan dissenting, considered the merits and upheld the legality of the stock allotments. The decree of dismissal was affirmed on the merits and the trial court has entered a final decree accordingly. This Court now reverses that judgment, reëstablishing the original decree of the trial Court, on the ground that a proper exercise of judicial discretion requires that the cause should not be heard. Thus after approximately two years of litigation in state and federal courts, all of which could, and I think should, have decided the case on the merits, the plaintiff must now start the litigation afresh in the courts of New Jersey.

In determining whether the federal courts should decline to exercise the jurisdiction conferred on them by removal, the nature of this controversy and its merits cannot be ignored. I do not stop to consider numerous objections to the stock allotments, urged by petitioner, which are not without weight. It suffices for present purposes that no plan of sufficient definiteness to comply with the New Jersey statute was ever submitted to the stockholders for their approval; and that even if it be conceded that a " plan " was approved, the action of the directors in alloting the stock to themselves, in violation of their duty as fiduciaries, exceeded the authority con-

ferred upon them by the stockholders, and was, therefore, *ultra vires*.

The statute directs that the board of directors shall "first formulate such plan," declare it "advisable," and call a meeting of stockholders to act on it. Without presenting for the consideration of the stockholders any workable plan of stock allotment, the directors, in effect, asked the stockholders to confer plenary authority on them to formulate a plan and to carry it into execution without any disclosure of its provisions. After the meeting, as before, no stockholder, not in the confidence of the directors, knew in what the plan consisted, who were the persons to participate in it, what principle was to control their selection or determine the amount of stock they were to receive, or the price they were to pay. It is a misuse of words of plain meaning to speak of such a proposal as a "plan," much less a formulated plan for stock allotment to employees, or as one which, in the form presented to the stockholders, the directors could have pronounced advisable or have carried into operation. It was no more than an invitation to stockholders to abrogate the discretion which the statute vested in them to approve a formulated plan, having at least some aspects of definiteness, and vest in the directors powers which could be conferred on them only by charter amendment in the manner prescribed by the statute. The invitation was accompanied by a skillfully phrased suggestion that it was necessary to accept it in order to hold the services of employees, and that, if accepted, the directors would cause new benefits to flow into the pockets of stockholders in the form of extra and increased dividends. Such a maneuver cannot rightly be regarded as a compliance with the plain language of the statute, which requires the directors first to formulate a plan for stock allotment and declare it advisable, and then to submit it to the stockholders for

their approval. If it were, it would be difficult to suggest any conceivable purpose of the statute which could not be thwarted by a similar procedure.

The respondents stand in no better position, even if we assume that the proposal submitted to the stockholders was a formulated plan, within the meaning of the New Jersey statute. For in that case, authority for the directors' action must be found in the stockholders' approval of the proposal which they submitted, and we must interpret the proposal and the action taken by the stockholders in terms of their legitimate expectation that the directors were complying with their duty as fiduciaries and not dealing with them at arm's length. They were entitled to read the proposal in the light of the fundamental duty of directors to derive no profit from their own official action, without the consent of the stockholders, obtained after full and fair revelation of every circumstance which might reasonably influence them to withhold their consent. *Wardell* v. *Railroad Co.*, 103 U. S. 651; *General Investment Co.* v. *American Hide & Leather Co.*, 97 N. J. Eq. 230, 233; 127 Atl. 659; see *United States Steel Corp.* v. *Hodge*, 64 N. J. Eq. 807, 813; 54 Atl. 1; *Globe Woolen Co.* v. *Utica Gas & Electric Co.*, 224 N. Y. 483, 489; 121 N. E. 378; compare *Meinhard* v. *Salmon*, 249 N. Y. 458; 164 N. E. 545; *Wendt* v. *Fischer*, 243 N. Y. 439; 154 N. E. 303. They were entitled to assume that the proposal involved nothing which did not fairly appear on its face and above all that it was not a cloak for a scheme by which the directors were to enrich themselves in great amounts at the expense of the corporation, of whose interests they were the legal guardians.

The respondents must, therefore, rest their case on the bare statement in their proposal to the stockholders that no employee or person actively engaged in the business of the company " shall be deemed ineligible to the bene-

fits of the plan," because a director or officer. But it would be extravagant to say that these words, addressed by men in the position of trustees to their beneficiaries, gave warning of the wholesale gratuities which the directors subsequently bestowed upon themselves. No more extensive authority could be derived from this language than the disclosure which it made. By consenting that the directors should be "eligible" to share in a plan avowedly for the benefit of employees, the stockholders did not consent that they should be the chief beneficiaries of their own unrestrained munificence, or that they should add any new bounties to the unrevealed stock allotments and bonuses which the directors had previously enjoyed in secrecy. Even if the stockholders consented that some of the directors should be eligible to benefit from action taken by other disinterested directors, they certainly did not consent that the allotments should be made by a group of directors who, because of the magnitude of the benefits they anticipated for themselves, were obviously incapable of passing an independent and unbiased judgment upon the propriety of the distribution which they coöperated in making to each other. Respondents' contention that if the directors were unable to vote on each other's participation no plan could be put into effect under which a majority of the directors were to participate, is without weight, for it obviously could be if the statute were followed and the plan revealed in its entirety to the stockholders.

To surmount these difficulties, respondents point to the fact that a representative of petitioner stated at the stockholders' meeting that favorable action on the proposal might result in the issuance of a large amount of stock to employees, including officers and directors, without adequate consideration, and that this did not induce the stockholders to express their disapproval. It is unnec-

essary to speculate whether this outcome is to be attributed to the fact that those present, being without the aid of prevision, regarded the prediction as too improbable to be credited, or to the fact that those who attended the meeting were not, for the most part, the stockholders, but the recipients of their proxies selected by the management of the corporation for the occasion. A statement made to them would, as a New Jersey court has said, fall "upon ears not allowed to hear and minds not permitted to judge; upon automatons, whose principals are uninformed of their own injury." See *Berendt* v. *Bethlehem Steel Corp.*, 108 N. J. Eq. 148, 151; 154 Atl. 321. In any event it is enough that neither in the notice of meeting and accompanying documents, which the stockholders saw and on which they relied, nor at the meeting itself, did the officers and directors disclose that such was their purpose.

We need not conjecture whether, if the directors had had the hardihood to disclose in advance the benefits which they were to award to themselves, the stockholders would nevertheless have given their approval. Nor is it important that these directors have successfully managed the corporation and that under their direction it has earned large profits for its stockholders. Their business competence did not confer on them the privilege of making concealed or unauthorized profits or relieve them of the elementary obligation which the law imposes on all corporate directors to deal frankly and openly with stockholders in seeking their consent to benefit personally by reason of their relationship to the corporation.

The directors, having failed to comply with petitioner's seasonable demand that they exercise their authority to bring this suit in the name of the corporation, petitioner was not required by general equitable principles or by Equity Rule 27 to appeal to the stockholders before bringing it, as the action complained of here was not one which

the stockholders could ratify. *Continental Securities Co.* v. *Belmont,* 206 N. Y. 7, 17; 99 N. E. 138; cf. *Delaware & Hudson Co.* v. *Albany & Susquehanna R. Co.,* 213 U. S. 435. Authority of the directors to bestow gratuities upon themselves in the form of subscription rights must be found in a plan approved in advance as the statute provides, by two-thirds of each class of stock. If no plan was presented to stockholders, as I think was the case, the entire stock issue was *ultra vires* and cannot be ratified any more than any other unauthorized disposition of corporate assets. If the proposal to the stockholders is regarded as a plan, so far as ordinary employees are concerned, as it plainly does not embrace authority to the directors to confer such extravagant benefits upon themselves, the result is the same, as to the stock allotted to the directors.

I cannot agree that a proper exercise of discretion requires us to deny to the petitioner the relief to which he is so clearly entitled. This is the first time that this Court has held that a federal court should decline to hear a case on the ground that it concerns the internal affairs of a corporation foreign to the state in which it sits. We may assume, without deciding, that neither a federal nor a state court of equity will, as a general rule, undertake to administer the internal affairs of a foreign corporation. But the case before us is, in this respect, unlike a suit to dissolve the corporation and wind up its affairs, *Wallace* v. *Motor Products Corp.,* 25 F. (2d) 655, 658; *Pearce* v. *Sutherland,* 164 Fed. 609; *Maguire* v. *Mortgage Co. of America,* 203 Fed. 858; cf. *Burnrite Coal Co.* v. *Riggs,* 274 U. S. 208, 212; or compel the declaration of a dividend, *Cohn* v. *Mishkoff Costello Co.,* 256 N. Y. 102; 175 N. E. 529, or interfere with the election of officers or the meetings of shareholders or directors. *Wason* v. *Buzzell,* 181 Mass. 338; 63 N. E. 909; *State*

*ex rel. Lake Shore Tel. & Tel. Co.* v. *De Groat,* 109 Minn. 168; 123 N. W. 417; see *Travis* v. *Knox Terpezone Co.,* 215 N. Y. 259, 263; 109 N. E. 250.

.We are presented with no problem of administration. The only relief which the petitioner merits on·the record before us or which he asks here is a decree that certain directors, now before the Court, restore to the treasury of the·corporation, also before the Court, certain shares of stock alleged to have been illegally issued to them, and. that certificates for the stock now in possession of the trustees, who are likewise before·the Court, be surren-' dered. There are no more obstacles to the rendition of an effective decree than in any other case in which a stockholder seeks reparation for depredations upon the corporate property committed by directors, some of whom only are before the Court. Compare *Wineburgh* v. *U. S. Steam & Street Ry. Advertising Co.,* 173 Mass. 60; 53 N. E. 145; *Ernst* v. *Rutherford & B. S. Gas Co.,* 38 App. Div. 388; 56 N. Y. S. 403; *Corry* v. *Barre Granite & Quarry Co.,* 91 Vt. 413; 101 Atl. 38; *Ganzer* v. *Rosenfeld,* 153 Wis. 442; 141 N. W. 121. The decree will be completely satisfied by delivery of the certificates, properly endorsed, to the corporation.. There is and can be no suggestion that such a decree cannot be pronounced and enforced as effectively by the courts in New York as it could be by those in New Jersey. Cf. *American Creosote Works* v. *Powell,* 298 Fed. 417, 419; see *Babcock* v. *Farwell,* 245 Ill. 14, 34; 91 N. E. 683.

The opinion of the Court concedes, as, indeed, the authorities which it cites show, that the decision does not rest upon any definite rule of general application. It is said that jurisdiction will be declined whenever considerations of convenience, efficiency and justice point to the courts of the state of the corporate domicile as appropriate tribunals for the determination of the particular

case. Such considerations are said to require that this
suit be dismissed though the petitioner is thereby sub-
jected to all the hazards of starting his action anew, in
the courts of New Jersey.

To support this conclusion, only two objections to the
maintenance of the suit are suggested in the opinion of
this Court or in that of the district court below. One is
that numerous beneficiaries, of the stock allotment, most
of whom are not officers or directors of the corporation,
are not made parties to this suit and presumably can be
reached as a group only by suit in New Jersey. Hence,
the intimation is, if we decide this case and other suits
should subsequently be brought in other jurisdictions,
different results may be reached on the same questions, a
possibility which can be avoided by forcing the petitioner
to bring a single suit in New Jersey. The other objection
is that the Court would be called upon to decide a novel
question of New Jersey law.

As petitioner has chosen to assert demands necessarily
restricted to the stock issued by the directors to them-
selves, he had no occasion to join as parties the several
hundred lesser employees, the great preponderance of
whom received allotments of less than fifty shares of stock.
Indeed, as the unconscionable conduct of the participat-
ing directors, a major factor in this case, would afford no
basis for proceeding against the other allottees, it is by
no means certain that the suit would be cast in any dif-
ferent form if brought in New Jersey.

The somewhat speculative possibility that those of the
participating directors who have not been served with
process in this suit may be called to answer in some other
court and exonerated is of slight importance compared to
the considerations favoring the exercise of jurisdiction.
Petitioner has chosen to bring his suit in New York. He
and all but one of the individual defendants reside there,

The principal office of the American Tobacco Company is in New York City and it is there that its books and records are found, its board of directors meets and the acts complained of took place. There the respondent, Guaranty Trust Company, is located, and its co-trustee resides. Before the decree can be enforced it must be obtained and the litigation must be brought to a successful conclusion. That involves the production in court of the necessary evidence. Of the parties to this case none but the American Tobacco Company is amenable to process in New Jersey; all are amenable in the Southern District of New York. In New York, petitioner can compel them and others connected with the corporation to attend as witnesses; all can be ordered to make complete discovery; and petitioner can compel the production at the trial of the records of both corporate defendants. We cannot assume that compulsion will not be necessary. The Tobacco Company carried to the highest court of the state its resistance to petitioner's preliminary application to inspect its books, (*Matter of Rogers* v. *American Tobacco Co.,* 143 Misc. Rep. 306, 257 N. Y. S. 321; aff'd 233 App. Div. 708, 249 N. Y. S. 993, leave to appeal denied). In New York also the individual defendants and the trust company can be reached by injunction *pendente lite,* restraining the transfer to innocent purchasers of the stock, certificates for which are already issued and in the hands of the trust company. Under the circumstances of this case, only considerations of more compelling force than the possibility of inconsistent decrees should lead a forum, convenient in so many respects, to decline jurisdiction.

I come then to the only ground which can plausibly be urged for declining the jurisdiction—that in one, but not necessarily a conclusive aspect of the case, the Court may be called on to decide questions of New Jersey law which, although novel, can hardly be said to be complicated or

difficult. If there were any principle of federal jurisprudence, generally applicable, that in cases between private parties federal courts of equity may, in their discretion, decline jurisdiction because called upon to decide an unsettled question of state law, I would willingly acquiesce in declining it here. But this Court has not declared such a principle and does not recognize it now. On the contrary, whether jurisdiction rests on diversity of citizenship or on a substantial constitutional question, this Court has consistently ruled that it is the duty of a federal court of original jurisdiction, and of this Court on appeal from its decree, to pass on any state question necessarily involved, however novel, and that the decision may be rested on that ground alone. *Siler* v. *Louisville & Nashville R. Co.*, 213 U. S. 175; *Risty* v. *Chicago, R. I. & P. Ry. Co.*, 270 U. S. 378.

Unless we are now to abandon that long settled practice, I can see much more reason for passing on this question than upon many others which this Court has decided. Our judgment would conflict with no local decisions, compare *Black & White Taxi Co.* v. *Brown & Yellow Taxi Co.*, 276 U. S. 518; *Burgess* v. *Seligman*, 107 U. S. 20; nor apply an alien policy to matters which are the subject of delicate feeling in the state. Compare *Gelpcke* v. *Dubuque*, 1 Wall. 175; *Railroad Commission of California* v. *Los Angeles Ry. Corp.*, 280 U. S. 145. Indeed, we may not even avoid deciding the question of state law by sending the case to New Jersey, for it is not suggested that if petitioner should elect to sue in the federal court for New Jersey, or if the suit should be properly brought there by removal from the state court, either that court or this may decline jurisdiction. Thus we should do no more in deciding the question of New Jersey law now than if the case were brought to us from the federal courts in New Jersey.

Even if decision of the question of New Jersey law were more embarrassing than it appears to be here, a proper exercise of discretion would seem to require that the bill be retained, and that an interlocutory injunction restraining any disposition of the stock by respondents be granted as prayed, pending the diligent prosecution by petitioner of a suit in New Jersey. Compare *Mallow* v. *Hinde*, 12 Wheat. 193; *Dunn* v. *Clarke*, 8 Pet. 1; *Stover* v. *Wood*, 28 N. J. Eq. 253.

If federal courts are to continue the general practice of deciding novel questions of state law whenever they are necessary or convenient grounds for the disposition of cases pending before them, there are peculiarly cogent reasons why there should be no departure from the practice in cases like the present. While a corporation in legal theory has only one domicile, in practice its activities are often nationwide and the legal domicile of the corporation, as in this case, is neither the place of its real corporate life nor the home of its officers and directors. Hence, if stockholders' suits, such as the present, are to be maintained with any hope of success, the practical necessities of making parties, securing evidence, obtaining the production of documents and relief by injunction against individual wrongdoers, justify, if they do not compel, their prosecution in the particular jurisdiction where necessary parties and witnesses may be found, rather than in the place of the technical corporate domicile.

Extension of corporate activities, distribution of corporate personnel, stockholders and directors through many states, and the diffusion of corporate ownership, separated from corporate management, make the integrity of the conduct of large business corporations increasingly a matter of national rather than local concern (cf. A. A. Berle, Jr. and Gardiner C. Means, The Modern Corporation and Private Property, 1932), to which the fed-

eral courts should be quick to respond when their juris-
diction is rightly invoked. We should be slow, indeed, to
make a reluctance to decide questions of state law, not
exhibited in other classes of cases, the ground for declin-
ing to decide this one.

MR. JUSTICE BRANDEIS concurs in this opinion.

MR. JUSTICE CARDOZO, dissenting.

Viewing the suit as one to reclaim the shares received
by the directors in breach of their fiduciary duties to the
corporation and the shareholders, I find no adequate rea-
son for the refusal to exercise jurisdiction, and this though
a different conclusion might be thought to be necessary if
relief were to be given upon grounds affecting the validity
of the issue as a whole.

In the circumstances of this case, the certificates allotted
to the directors may be charged with a constructive trust,
and surrendered to the corporation to be held in its treas-
ury, without impeaching a single certificate other than
their own.

There is no need to consider whether the " plan " as
proposed is insufficient on its face, with the result that
the innocent employees as well as the culpable directors
will be deprived of its benefits. If it be taken as suffi-
cient, the shareholders who voted for it are not charge-
able with notice that fiduciary powers would later be
perverted by the award to the fiduciary of extraordinary
benefits. Consent will not protect if reason and modera-
tion are not made to mark the boundaries of what is done
under its shelter.

I leave the question open whether in other circumstances
or with other consequences there may be a cancellation
of the shares of a foreign corporation in the absence of an
adjudication by the courts of the domicile. Here the or-

ganic structure of the corporation, if affected by the decree at all, will not be changed in such a way as to work substantial detriment to any stranger to the suit, but the fruits of an unjust enrichment will be put back into the treasury. I think we are at liberty to do so much, if nothing more, without waiting upon the judgment of any other court.

The doctrine of *forum non conveniens* is an instrument of justice. Courts must be slow to apply it at the instance of directors charged as personal wrongdoers, when justice will be delayed, even though not thwarted altogether, if jurisdiction is refused. At least that must be so when the wrong is clearly proved. The overmastering necessity of rebuking fraud or breach of trust will outweigh competing policies and shift the balance of convenience. Equity, it is said, will not be over-nice in balancing the efficacy of one remedy against the efficacy of another when action will baffle, and inaction may confirm, the purpose of the wrongdoer. *Falk* v. *Hoffman,* 233 N. Y. 199, 203; 135 N. E. 243. Of the shares allotted to directors as contrasted with those allotted to other employees, most are owned by the defendants sued. Whatever shares belong to others will be untouched by the decree. With all the procedural complexities possible hereafter if jurisdiction be declined, the hazard of inconsistent judgments affecting the directors *inter se* will not avail without more to halt the processes of justice and the award of such relief as the court is competent to give against those subject to its power.

I agree with MR. JUSTICE STONE for the reasons stated in his opinion that a breach of the fiduciary duties of the directors is a legitimate inference from the allegations of the bill, and agree with his conclusion that the cause should be remanded to the District Court for a determination of the merits.