**UNITED MILK PRODUCTS CORPORATION et al. v. LOVELL et al.**

**LOVELL et al. v. UNITED MILK PRODUCTS CORPORATION et al.**
Nos. 6829, 6830.

Circuit Court of Appeals, Sixth Circuit.
March 13, 1935.

924

H. F. Burns and Newton D. Baker, both of Cleveland, Ohio (Albert R. Jube and John J. Jansen, both of New York City, John Adams and Baker, Hostetler, Sidlo & Patterson, all of Cleveland, Ohio, and Chamberlin, Kafer, Wilds & Jube, of New York City, on the brief), for United Milk Products Corporation and others.

W. T. Kinder and Clan Crawford, both of Cleveland, Ohio (Ellis R. Diehm, Tolles, Hogsett & Ginn, Squire, Sanders & Dempsey, and Klein & Diehm, all of Cleveland, Ohio, on the brief), for Lovell and others.

Before MOORMAN, SIMONS, and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

The action below was a class suit origi-nally begun in the state court by a minority preferred stockholder against the corporation and certain directors to enjoin the consummation of a reorganization plan. The case was removed to the United States District Court, where other preferred stockholders intervened as parties plaintiff. The petition prayed that all steps taken be set aside, and further consummation enjoined, but if this were not feasible, for judgment in the alternative for the dissolution price of the plaintiff's stock, which, by the terms of the certificates, was $100 par and accrued dividends, or $114 a share. The District Court, upon fact findings and legal conclusions adverse to the defendants, granted relief by way of damages, but its decree awarded plaintiffs but $49.66 a share for their stock, being its pro rata share of the going concern value of the corporation's assets upon dissolution, and directed the surrender by the plaintiffs of their common stock.

From the decree both parties have appealed; the plaintiffs contending that they are entitled to recover the dissolution value of their stock, with accrued dividends, and to retain their shares of common stock; and the defendants contending that no basis for any relief exists, that the bill should have been dismissed, but if entertained, damages should have been limited to the market value of the shares at the time of reorganization.

At the outset the court below was, as this court is now, faced with a question of jurisdiction. The defendants assert that the purpose of the bill and the relief prayed involve interference with the domestic affairs of a foreign corporation, and that the court should have refused jurisdiction upon authority of Wallace v. Motor Products Corporation, 15 F.(2d) 211 (D. C.), affirmed 25 F.(2d) 655 (C. C. A. 6), and relegated the plaintiffs to the courts of Delaware, under the laws of which state the corporation was formed. Considerations of convenience and expediency are undoubtedly important in determining whether a court sitting in one state will exercise jurisdiction over the internal affairs of a corporation organized under the laws of another. One of the controlling reasons for the court's refusing to exercise jurisdiction in the Wallace Case

was its apparent lack of power to render an effective decree therein. While the petition here originally prayed for injunctive relief, it is now conceded that the reorganization plan having been carried into effect, it is no longer feasible to grant it, and the plaintiffs press no remedy other than a decree for damages. The defendants are all residents of Ohio, and the corporation's principal assets are there located, so that no lack of power to enforce the decree if sustained or amended in the respects sought, appears, and in any event the District Judge was free to exercise a sound discretion, pass upon the merits of the controversy, or decline to do so and relegate the plaintiffs to an appropriate forum. Rogers v. Guaranty Trust Co., 288 U. S. 123, 130, 131, 53 S. Ct. 295, 77 L. Ed. 652, 89 A. L. R. 720. No grounds for concluding that discretion was abused here appear.

The United Milk Products Corporation was incorporated in Delaware in 1925, and began business on January 1, 1926, carrying on its activities not only in Ohio but in a number of other states, and through a subsidiary in California. Its authorized capital stock was 250,000 shares preferred, par value $100 per share, and 250,000 shares of common without par value. The preferred stock was entitled to cumulative dividends of 7 per cent. per annum, $100 per share and accumulated dividends on dissolution, and a redemption value of $110 per share and accumulated dividends. The preferred stock had no voting rights, except that the consent of a majority was required for any amendment affecting its preferences. The common stockholders exercised all voting power, and subject to the rights of the preferred shareholders, were entitled to all of the earnings and to all assets upon dissolution. The corporation's charter contained a reservation of the right to amend, alter, or repeal in the manner prescribed by statute, to which all rights of stockholders were subject.

For the first five years of its existence the corporation was successful, and paid its preferred stock dividends, though no dividends were ever paid upon its common stock. In 1930 and 1931 it suffered substantial losses from operations, and defaulted on its quarterly preferred stock dividend due April 1, 1931, and thereafter no such dividends were paid. The market value of the preferred shares after the first dividend default fell from $37 per share to $17 per share, and by the end of 1931 sold as low as $11 per share. The market value of the common stock during that period fell to $1 per share.

In 1931 the board of directors of the corporation concluded that readjustments, both in capital assets and in capital stock structure, were required. Not only had there been an impairment of capital assets by reason of operating losses which made it impossible to meet preferred stock dividends, and unlikely that such dividends could be resumed for a long time to come, but there had also been substantial depreciation both in tangible and intangible assets as carried upon the books. The current value of plants was approximately $300,000 less than their book value, and an intangible asset set up under the designation "Milk Supply," consisting of contracts with milk producers, which had been carried upon the books since organization at $4,364,662.08, no longer represented any real value.

Faced with continued operating losses, impairment of assets, a capital deficit in excess of three and a half million dollars, and without any early prospect of resuming dividends, the directors, upon consultation with the corporation's counsel, resolved upon a plan of reorganization. The plan as finally evolved and submitted to the stockholders contained these elements: A new company was to be formed under the title "United Milk Products Company," to which all assets of the old corporation, except $208,215 in cash, were to be transferred in exchange for 55,524 shares of preferred stock, and 34,899 shares of common stock; the new company was to assume all the liabilities of the old corporation; the reserved cash was to be distributed among the old preferred stockholders in the ratio of $3 per share; each preferred stockholder was to be given eight-tenths of a share of preferred stock of the new company for each share of preferred stock in the old corporation, and each common stockholder one share of the new company's common stock for each 6 shares of the old common stock. The preferred stock of the new company was to have the following rights: Cumulative dividends of $3 per share per annum; equal participation with common stock in all dividends after the payment of preferred dividends; $100 per share and accumulated dividends on dissolution, and the same amount upon redemption.

It will be noted from an analysis of the proposed plan that it involved some advantage—whether substantial or otherwise de-

pended upon subsequent events—to each group of shareholders, and likewise some disadvantages. The preferred shareholders were to surrender their right to accrued dividends (the payment of which had been rendered highly improbable by operating losses), to accept a $3 per share annual return in place of a $7 return, to surrender 20 per cent. of their number of shares, and to have the redemption value of their shares reduced from $110 to $100 per share. To offset this sacrifice the preferred shareholders were to receive immediately $3 per share in cash for each share held, which it is contended was equivalent to $15 per share for each share surrendered, at a time when the market value of such shares was only $10. The preferred stockholders were also entitled to participate without limit with the new common stock in all earnings above the preferred stock dividend requirement. Since the new company was to have but 34,899 shares of common stock, while the preferred shares were to be 55,524 in number, it is contended that the preferred shares would receive over 61 per cent. of such additional distribution. The common stockholders would each receive in the new company but one-sixth the number of shares owned in the old corporation. On the other hand, such shares in distribution of earnings would be subject to but a $3 per annum preferred dividend instead of a $7 per annum preferred dividend, with no accrued accumulations, although they would be obliged to share with the preferred stockholders earnings beyond that point.

Before submitting the plan formally to the stockholders of the corporation, the directors discussed it in its general outline with a number of the larger holders of preferred stock, representing in all about one-half of the outstanding preferred stock, and including the chairman of the board of the Union Trust Company of Cleveland, which held a large amount of the preferred stock, both in trust and as collateral. After receiving informal approval of the plan by stockholders representing this number of preferred shares, the plan of reorganization in printed form was mailed to all common and preferred stockholders on March 5, 1932. Stockholders were advised of the existing situation, the improbability of early resumption of regular dividends on preferred stock, and the necessity of writing down the value of tangible and intangible assets. A majority assent to the reorganization was required from each class of

stockholders, and on August 30, 1932, the holders of more than 75 per cent. of preferred stock, and of more than 70 per cent. of common stock, having filed their assent with the corporation, the directors declared the plan operative, and for the best interest of the corporation, and called meetings of both classes of stockholders for September 27th to take formal action. On September 22d the present suit was filed. No action having been taken on the prayer for temporary injunction, and after several adjournments of the stockholders' meetings, the plan was finally ratified on December 9, 1932, by the unanimous vote of all stockholders present in person or by proxy. The vote represented more than 77 per cent. of the preferred stock, and 72 per cent. of the common stock. Notwithstanding this approval, the assets were not immediately transferred, but notice was given to stockholders that the transfer would take place as of January 1, 1933. Meanwhile the state court had denied the petition for a temporary restraining order, and the case had been removed to the District Court, where nearly a year later, and after consummation of the plan, it came to trial on December 15, 1933. By that time all but 1.7 per cent. of the preferred stock, and all but 15 per cent. of the common stock, had been exchanged for shares in the new company.

The District Judge, conceiving the reorganization plan to be not only unfair to the preferred stockholders but entirely unnecessary for the attainment of the benefits to be derived from proper readjustments of capital, which could have been equally secured under an alternative plan submitted by some of the interveners but rejected by the directors, that losses suffered by the holders of preferred stock accrued by way of gains in equal amount to common stockholders, concluded that, in the originating, advocating, and carrying out of the reorganization, the directors disregarded their fiduciary relationship to the stockholders. He held some of them to have acted from fraudulent motives and self-interest in that their personal interest as common stockholders was not disclosed, and held others guilty of constructive fraud. While the reorganization undertaken was in the court's opinion permitted by the laws of Delaware, nevertheless the breach of the fiduciary relation rendered the steps taken in effecting it void and of no effect. Since, however, it would be inequitable to all parties to overturn the reorganization or the sale and

transfer of assets thereunder, and impossible to restore the former status, it entered the decree for damages above indicated, and the appeal and cross-appeal followed.

In considering the problem presented it must be understood that the internal management of a corporation is generally left to the discretion of its stockholders and directors, subject to limitations in its charter, and that courts will interfere in intra vires transactions only where there is misconduct equivalent to a breach of trust, or where directors stand in a dual relation which prevents an unprejudiced exercise of judgment. United Copper Securities Co. et al. v. Amalgamated Copper Co. et al., 244 U. S. 261, 264, 37 S. Ct. 509, 61 L. Ed. 1119; Rogers v. Guaranty Trust Co. of New York, 60 F. (2d) 114, 120 (C. C. A. 2), reversed on other grounds 288 U. S. 123, 53 S. Ct. 295, 77 L. Ed. 652, 89 A. L. R. 720, supra; Raff v. Darrow, 184 Ind. 353, 111 N. E. 189. Also in determining whether there has here been any breach of a fiduciary relation it must be borne in mind that while the reorganization plan was initiated by the directors, it neither was nor could have been made effective without the approval of the preferred stockholders at a meeting duly called for that purpose. While the stockholders surrendered preferences reserved to them by their certificates, it was clearly within their competency to make such surrender, providing only that they were not prevented from exercising an informed judgment by any misrepresentation or concealment of material facts by the proponents of the plan. Courts will not substitute their judgment for that of the governing body of private corporations, except in the case of actual or constructive fraud.

There seems to us to be no basis in the record for a conclusion that the reorganization plan was in furtherance of a fraudulent conspiracy to mulct the preferred stockholders. Conspiracies are hatched in the dark, and sinister purposes are more readily achieved when time permits neither inquiry nor deliberation to thwart them. There was here neither secrecy nor haste. Before the plan was submitted formally to the stockholders, some eighteen of them, holding approximately 50 per cent. of the preferred stock, were consulted. Of these stockholders six held no common stock whatsoever, seven were holders of preferred stock substantially in excess of their common stock holdings, three held an equal number of shares of both classes of stock, and but two held more of the common

shares than of the preferred. Moreover, nearly a year elapsed between the presentation of the plan and the time it was put into operation. This is not the usual technique of fraudulent conspirators.

We come then to the plan as presented to the two groups of shareholders. It may be conceded that even without actual fraud there may be such misrepresentation, or such withholding of facts, however innocent in purpose, as to constitute constructive fraud. With that in mind we have explored the plan, and accompanying communications from the directors. It is in our view impossible to say that the measure of sacrifice which the adoption of the plan would require of the preferred stockholders was in any way misrepresented or concealed. In express terms the reduction of stock holdings, of dividends, of redemption rights, and of all other "rights accrued and to accrue," is placed before the stockholders.

It is contended, without reference to any specific language of the plan, that its general purport is to persuade the stockholders that in no other way than by its adoption could the benefits to the corporation resulting from writing down of capital assets or readjustment of capital structure, be achieved. We find nothing in the plan to warrant such implication. Nor is the fact that a better plan could in our present view have been devised, a test by which fraudulent conduct or the breach of a fiduciary relation is to be determined. The relative merits of plans of reorganization are subjects upon which the minds of reasonable men may, and almost universally do, differ. The common and the preferred stockholders accepted in overwhelming majority the plan as presented. Our only inquiry is as to whether they were by the directors prevented from exercising an informed judgment.

In this respect it is said that the directors concealed from the stockholders the personal interest that they themselves had in enhancing the value of the common stock at the expense of the preferred. It is undoubtedly true that the existence of an undisclosed personal interest taints with suspicion the acts or advice of a fiduciary having such interest. We do not, however, view the circumstances here involved as demonstrating an undisclosed personal interest in common stock on the part of the directors. We need not consider the analysis so painstakingly presented, that measured in terms of market value the directors who had common shares greater in number

928

than their preferred shares, had still a greater financial interest in respect to preferred shares than they had to common, nor consider whether the majority of those who proposed the plan were without predominating interest in respect to the common stock. We think their interest in the latter, such as it was, must have been fully understood by all of the stockholders, and where not so understood were facts within the reach of all. The preferred stockholders had no voting rights. The directors were all elected by the votes of the common stockholders. It is inconceivable that any preferred stockholder could have failed to understand that the proponents of the plan either themselves owned or were in control of substantial blocks of common stock. They could not otherwise have been directors. Moreover, the books of the corporation were open to all stockholders. It is true that such stock records might not have disclosed the extent to which common stock was held in the family of each director, but it is not to be assumed that such stock holdings would not have been disclosed upon inquiry. There is no record of such inquiry. The situation in this respect is not unlike that discussed by this court in Blakeslee v. Wallace, 45 F.(2d) 347. We think there was no fraud, either actual or constructive, in the failure of the plan of reorganization to specify the stock holdings of its proponents in respect to the shares of common stock held or controlled by each.

Nor is there substance to the complaint that there was a breach of fiduciary relation in the voting of the proxies. The plan came to the stockholders with the advice of the directors that it be adopted, and that proxies be forwarded to the offices of the company for that purpose. There could be no possible doubt in the mind of any preferred stockholder when he forwarded his proxy that he was sending it for the purpose of having his stock voted in favor of the plan.

The case of First National Bank of Cincinnati et al. v. Flershem, 290 U. S. 504, 54 S. Ct. 298, 78 L. Ed. 465, 90 A. L. R. 391, lends no support to the contention of the plaintiffs that there was here a breach of a fiduciary relation. That case involved rights of minority debenture holders, which upon default could have been enforced by suit, but which with deliberate purpose were impaired by defaults in debenture interest at a time when the corporation was fully able to pay, and by a receivership collusively brought about. There was here no collusive

default in preferred stock dividends and no claim that they could legally have been paid. The facts are wholly dissimilar, and the principles there applied are not here applicable.

It is to be added that the later history of the preferred stock, its rise upon the market, the payment of dividends thereon out of earnings, the deposit of all but a small fraction thereof for exchange, the failure of any assenting stockholder to complain or to testify that he was deceived, are, while not controlling, important circumstances to be considered in determining whether there was any breach of confidence on the part of the directors, and so considered they are in negation of and not in support of the implications sought to be drawn by the plaintiffs.

The decree is vacated, and the bill dismissed.