The complainant filed bill to foreclose a mortgage in the sum of $10,000. The defendant mortgagor holds forty-seven installment shares in the complainant association pledged to secure the payment of the mortgage and filed answer admitting all the allegations in the bill of complaint with the exception of the allegation as to the withdrawal value of the aforementioned shares concerning which she alleges that *Page 580 
"complainant wrongfully calculated the withdrawal value of the shares of stock owned by the defendant Lena Zukerberg by not burdening all of the stockholders of the association with their proportionate share of losses incurred by the association."
The answer contains a counter-claim praying the right to redeem by the payment of the amount due "less the * * * withdrawal value of the aforementioned stock, said value being based upon a proportionate share of the losses being borne by all of the members of the association," charging that the association incurred certain losses due to deflation in real estate, which losses it charged principally to installment shareholders, without charging other classes of shareholders with their proportionate share of the same, thereby unlawfully decreasing the withdrawal value of defendants' installment shares.
The matter is before me on motion to strike the answer and counter-claim on the ground that it is sham and frivolous and does not set forth a defense to the bill.
In support of the motion, complainant's affidavits set forth order number 1-A of the commissioner of banking and insurance requiring the complainant association to set up reserves not less than the total of:
"A. The difference between 70% of the original amount of the mortgage or mortgages taken by your association upon real estate now owned by it and the total amount at which real estate is now carried on the books of this association as an asset, plus all unpaid municipal liens thereon if such total exceeds such percentage.
"B. The difference between 70% of the original amount of the mortgage or mortgages held by your association which are excessively in arrears and the anticipated cost of the property so mortgaged to your association whether acquired by foreclosure or otherwise, plus all unpaid municipal liens thereon if such anticipated costs exceeds 70% of the original amount of such mortgage or mortgages.
"Dividends or profits shall not be declared, paid or apportioned upon or to any shares." *Page 581 
Orders numbers 3 and 3-A directing the method for setting up reserves as follows:
"(a) From real estate reserves.
"(b) From all other reserves, undivided profits or unapportioned profits.
"(c) From net profits of the current fiscal period.
"(d) From profits previously apportioned. In setting up reserves from this source, the following method shall be used: The amount of reserves to be set aside from such apportioned profits as compared with the total amount of such apportioned profits shall be calculated on a percentage basis, and such percentage shall then be used in reducing the profits apportioned to the shares of each member.
"(e) If any or all of the reserves set up from the above mentioned sources are insufficient to build up the required reserves, then all classes of shares shall be assessed pro rata
upon actual payments on shares."
The proof shows that for the fiscal year terminating February 28th, 1932, the association acquired real estate at a cost of $228,105.45, and the profits apportioned at that time were $81,792.77, with a reserve account of $22,850.40. Thereupon the association caused its real estate to be appraised, as a result of which on July 7th, 1932, the board of directors by resolution determined that the reserve account was insufficient to meet unexpected losses as well as losses on real estate already owned by reason of deflated values, and resolved that $40,896.39 be transferred from the apportioned profits account to the reserve account and the same to be duly pro-rated from the individual accounts of the participating shareholders and ear-marked as a contingent reserve account to meet any losses the association may sustain. The financial statement at the close of the fiscal year February 28th, 1933, showed real estate owned $285,344.95, with profits apportioned of $30,725.01 and reserve account $73,525.66.
On or about March 4th, 1933, a bank holiday was declared by the president of the United States, and under the orders of the commissioner of banking and insurance, the operations *Page 582 
of all building and loan associations were suspended until further notice, and on March 14th, 1934, the commissioner issued order 1-A above to the complainant. In order to meet the requirements of that order it became necessary to increase the reserve account to $109,954, which was done by appropriate action on the part of the board of directors by transferring what remained of the apportioned profits account, namely, $30,725.01, plus $5,703.37 of current earnings to the reserve account.
In resisting the motion to strike the answer it was contended:
(1) That complainant wrongfully calculated the withdrawal value of defendant's shares of stock because prepaid shareholders were not burdened with a proportionate share of losses; (2) that the orders of the commissioner of banking and insurance numbers 1-A, 3 and 3-A, did not have the force and effect of law; and (3) that the action of the board of directors was unlawful.
I. The prepaid shareholders paid full value for their shares and were not given the right to participate in the profits of the association derived from premiums, fines, withdrawal penalties and interest on the association's investments. The association agreed to pay such shareholders a fixed dividend in lieu of participation in the general profits of the association. P.L.1925 ch. 65 § 74, of an act regulating building and loan associations sanctions such contract. It provides "that agreements may be entered into by and between any such association and any of its members holding paid-up shares, as the constitution shall provide, whereby said members waive participation in the general profits of such association in consideration of a fixed profit on the paid-up shares." The complainant in its constitution, article 3, section 4, provides for the issuance of prepaid shares and interest thereon at such rate as the directors may from time to time determine. The certificate issued by the association to its prepaid shareholders provides that such shares shall bear interest at five per cent., and may be called in and canceled at any time upon notice and payment of the par value and *Page 583 
interest to the date of cancellation, and that beyond the payment of five per cent. interest such shareholders "shall not further participate in the general earnings of the association."
The installment stockholders enjoy many possible advantages which are denied to the prepaid shareholders. They participate in all of the profits of the association and this expedites the maturity of their stock and profitable winding up of their financial venture. The profits on their investment depend upon the time the association runs, while the holders of paid-up shares obtain their profits in stipulated interest as the time proceeds. In both instances it is a case of profit upon money invested in the stock of the association — the common fund which constitutes the capital of the association. They constitute, therefore, simply a different class of stockholders. Latimer v.Equitable Loan and Investment Co., 81 Fed. Rep. 776; Towle v.American Building and Loan Association, 75 Fed. Rep. 938. That paid-up shareholders are a different kind of shareholder from that of the installment shareholder clearly appears in section 74 of the act of 1925, chapter 65, "that no member shall hold paid-up shares in any such association of a value in excess of two per centum of the liability of such association for dues on installment shares, and in no case shall a member hold paid-up shares in any such association of a value in excess of twenty-five thousand dollars." From this limitation, however, are excepted "paid-up shares that are received by a person by will or under the statute of distribution, or held as collateral security." No such limitation is imposed upon installment shareholders.
The complainant association in the instant case, by authority of the statute and under its constitution, entered into agreement with its paid-up shareholders whereby these members waived participation in the general profits of the association in consideration of the payment of interest at the rate of five per centum per annum. They had no interest in the profits set up on the books which were transferred to the reserve account.
Much stress was laid in support of the proposition that prepaid shareholders should contribute pro rata by way of *Page 584 
an assessment or by withholding future dividends or interest, toward the reserves required by the department because of that portion of section 74 which provides that "all members shall occupy the same relative status as to debts and losses of such association." I cannot construe this language to mean that losses should be borne proportionately out of profits in the case of installment shareholders and out of capital in the case of prepaid shareholders. The language of the section can only have application in case the capital is impaired and the association is insolvent for there are no losses to which the prepaid shareholder can be held to contribute until all the profits are dissipated.
The banking commissioner's order fixing the method of setting up reserves properly directed after specifying the sources from which the reserves should be set up that "if any or all of the reserves set up from the above mentioned sources are insufficient to build up the required reserves, then all classes of shares shall be assessed pro rata upon actual payments" (capital) "on shares." In the instant case, the sources out of which the reserves were set up to meet losses being sufficient, the capital of the prepaid shareholders properly were not burdened therewith.
II. The statute (P.L. 1933 ch. 258 p. 694) vests in the commissioner of banking and insurance of this state the power to make orders for the purpose of conserving the assets of the building and loan associations of this state, which orders shall have the same force and effect as law and be binding on any and all building and loan associations of this state, whereby:
"(a) To regulate the method of paying the withdrawal value and/or maturity value of shares of any and/or all such associations;
"(b) To regulate and/or postpone the filing of applications for withdrawal of shares and of requests for payment of maturity value of shares of any and/or all such associations;
"(c) To regulate or postpone the payment of all or any part of the maturity value or of the withdrawal value of shares of any and/or all such associations; *Page 585 
"(d) To require any and/or all such associations to establish additional reserves or increase present reserves and to regulate any reserves of any and/or all such associations and to prescribe the manner in which such reserves shall be established;
"(e) To regulate, allocate, prohibit or postpone the receipt and/or disbursement of funds by any such associations," c.
The statute recites that "a public emergency exists as the result of a prolonged period of economic depression," and provides in section 5 that the act shall become inoperative after three years from the date of its approval. The power thus exercised by the legislature was declared a valid and constitutional exercise of the police power to protect members of the public in the present emergency from injury by reason of conditions presently existing. Krimke v. Guarantee Buildingand Loan Association of Newark, 112 N.J. Law 317, and authorities therein cited.
III. Aside from the fact that the action of the board of directors was taken in pursuance of the orders of the commissioner of banking and insurance, which orders had the force and effect of law, the act of 1925, section 7, as amended byP.L. 1929 p. 463 and P.L. 1930 p. 26, places the management of the affairs of such associations in a board of directors, and subject to the limitations imposed by statute, and the provisions of its by-laws not inconsistent therewith, the board of directors determine the withdrawal value of shares, and in such action as in all others of a discretionary character, it shall be guided by the general purpose to effect and maintain the economic security of the association. The defendant was a defaulting member and as such had no right to the inclusion of a portion of the profits in the ascertainment of the withdrawal value of her shares, unless such right is conferred by statute or by-law. The defendant in the first place was a member, and in the second place a borrower. In the former she had no right to an account of profits except upon termination of the scheme, unless such right is expressly conferred by the statute or the contract. A borrower's claim *Page 586 
to have all items, including profits, which go to swell the general fund of the association, taken into account, and to be given credit therefor, "at any intermediate stage, has no foundation in law or equity." Thirteenth Ward Building and LoanAssociation of Newark v. Weissberg, 115 N.J. Eq. 487. The discretion residing in the board of directors with respect to profits is to be exercised in the light of existing conditions, and regard must of necessity be had to the absorption of future losses reasonably to be anticipated. To permit defendant in the ascertainment of the withdrawal value of her shares credit in full of the profits apportioned and place the entire burden of future losses upon the shareholders who remain would be most unjust. Thirteenth Ward Building and Loan Association v.Weissberg, supra.
The answer and counter-claim will be struck.