**RENOLD v. WITHERS et al.**

No. 5303.

District Court, D. New Jersey.

March 7, 1936.

Nicholas A. Tomasulo, of Roselle Park, N. J. (John Warren, of Jersey City, N. J., of counsel), for complainant.

Louis J. Cohen, of Newark, N. J. (Merritt Lane, of Newark, N. J., of counsel), for defendants Withers, Minier, Thomson, Cohen, and Roselle Park Building & Loan Association.

Cox & Walburg and Rudolph H. Heydt, all of Newark, N. J., for defendants Drake, McDevitt, Wood, Harwood Fish, Jr., Woodruff, Wanderweg, Thompson, Goddard, Gunter, Camillo, Jentsch, Coniglio, and Loeser.

FORMAN, District Judge.

Complainant in this cause is the holder of 50 shares of Roselle Park Building & Loan stock. The association conducted its business in the town of Roselle Park, Union county, N. J., and was of considerable proportions, having assets running into the millions of dollars and shareholders numbering 3500 in recent years.

The complainant brings his bill against a number of defendants, of whom Carl K. Withers is commissioner of banking and insurance of New Jersey, Ernest A. Minier is deputy commissioner of banking and insurance, Andrew Thomson is a special assistant deputy commissioner and is the executive in charge of the association, and Louis J. Cohen, who was counsel designated by the commissioner. The other defendants were officers and directors of the association at the time it was taken into possession by the then commissioner of banking and insurance, William H. Kelly, on September 8, 1934, and the association is likewise made defendant.

William H. Kelly was succeeded by Carl K. Withers as commissioner of banking and insurance on April 29, 1935, but Commissioner Withers has continued the subordinate officers Minier, Thomson, and Cohen, in their respective capacities above mentioned.

The complainant charges that there has been no liquidation, merger, or return of the affairs of the association to its directors, and that the purpose of the officials of the banking and insurance department, appointed by Commissioner Kelly and continued by his successor, Commissioner Withers, was to "disband the board of directors and disorganize the corporate structure of the defendant association and deprive all the shareholders, who were members of the defendant association, of the services of their elected representatives, as such, to safeguard and protect the interest of such members, so that the elected representatives of the members of the defendant association could not inquire into or supervise the acts and expenditures of the Commissioners of Banking and Insurance in possession of the property and business of the defendant association and their deputies, counsel, agents, employees and contractors, and so that there would be no person or persons to act officially on behalf of the defendant association to receive notices of applications of the Commissioners of Banking and Insurance for approval of the Court of Chancery of allowances and expenses of the Commissioners of Banking and Insurance, so that the board of directors of defendant association could not, on behalf of the defendant association and its members, employ and instruct counsel to object in the Court of Chancery to proposed allowances and expenses, so that the board of directors of defendant association would not, through its examining committee, ascertain the facts in this bill of complaint set forth, so that the board of directors of the defendant association would not employ counsel and authorize him on behalf of the defendant association to apply to the Court of Chancery to enjoin further proceedings of the Commissioner of Banking and Insurance, or enjoin him from doing acts as herein alleged, which are not in, but are in fact against, the best interests of the members and shareholders of defendant association or for such other relief as may be equitable and just and so that there would be no board of directors of defendant association to receive the business and assets of the defendant association, and so that the Commissioner of Banking and Insurance could, as a condition for the return of the association, appoint officers and directors of defendant association."

It is further charged, among other things, that "having induced the officers and the members of the board of directors of the defendant association to refrain from functioning as such to the extent permitted and required by law during possession of the defendant association by the

Commissioner of Banking and Insurance, and having thus prevented the holding of meetings of shareholders, the said Ernest A. Minier and Louis J. Cohen took upon themselves the active conduct and direction of the affairs of the defendant association, without check by the elected representatives of the shareholders of the defendant association and in total disregard of the statutes of the State of New Jersey as to requiring approval of all allowances and expenses of the Commissioner of Banking and Insurance in possession on notice to the defendant association, as hereinafter alleged."

It is further charged that the said Ernest A. Minier and Louis J. Cohen, "with the acquiescence of the defendant, Andrew Thomson and with the approval of the said Commissioners of Banking and Insurance respectively, during their terms of office, assumed the power of allocating the business of the defendant association and determining all policies thereof and deprived the said Andrew Thomson as Special Assistant Deputy Commissioner of Banking and Insurance and as the executive in charge, of any power in connection with the administration of the affairs of the defendant association, in so far as the appraisal of assets, the allocation of the insurance business and the care, management, upkeep and sale of the real estate of the defendant association was concerned, and ousted the then local attorneys of the defendant association, and gave to Louis J. Cohen all of the legal business of the defendant association, in violation of the statutes of the State of New Jersey aforesaid, employed one David Cronheim, a realtor of Newark, Essex County, a close friend and former associate of the said Ernest A. Minier, to appraise the Union County assets of the defendant association, at an expense to the defendant association of $6292.00; gave to the said David Cronheim all of the insurance which those operating the association during the Commissioners' possession could control; gave to the said David Cronheim the exclusive management and sale of all of the Union County real estate of the defendant association; gave to the said David Cronheim all of the tax appellate work of the defendant association; prevented the said Andrew Thomson, the executive in charge of the affairs of the defendant association during the possession by the Commissioner of Banking and Insurance, from awarding contracts for the repair and improvement of the defendant association real estate, and gave all of such work, without competitive bids and at excessive prices, to the Whitney Company, a corporation of the State of New Jersey, with offices in the City of Newark, County of Essex and State of New Jersey, and managed and controlled by one or more friends and former close business associates of the said Ernest A. Minier, and ordered that no contractors of Roselle, or Roselle Park, or of Union County could bid directly upon work to be done for the defendant association during the possession by the Commissioners of Banking and Insurance, but required all of such contractors in the event that they desired to bid upon such work, to submit their bids to the Whitney Company who, in the event that the work was performed by such local contractors, charged the defendant association a higher price than charged by the local contractors."

The bill of complaint further charges an inequitable distribution of losses upon certain of the membership of the association in that it was the vested right of complainant and all other members of the association holding cumulative shares, in the event that losses or anticipated losses in such association should exceed the sum of its applicable reserves and current profits, to have the losses charged proportionately to all members, regardless of the type of shares held by them. The complainant specifically charges that the said commissioner of banking and insurance, in the month of August, 1935, recaptured distributed dividends which had been previously declared and credited to the long and short-term installment and single-payment shares of the defendant association. Upon such declaration and credit, such funds became part of these shares and of the capital of the association and the property of the members to whose shares they had been credited. The commissioner's action in regard to the application of these funds, the complainant alleged, was in violation of the terms and provisions of the membership contract of the complainant with the association, based on the provisions of its constitution and the applicable statute of the state of New Jersey in such case made and provided, in view of the fact that the earnings of the holders of income shares remained undisturbed by him.

Other irregularities are set forth in the bill in considerable detail, as, for in-

stance, the sending out of the statement by the commissioner under date of August 20, 1935, which, complainant alleges, was incomplete, deceptive, confusing, and not the kind of a statement required to be issued to shareholders under the applicable statute.

The complaint contains a number of prayers for relief, among them, that the court adjudicate the rights of the complainant and all other members and creditors of the association and fully administer the association, decreeing that the dividends theretofore allegedly recaptured by the commissioner of banking and insurance be recredited so that the losses would be proportioned on all classes of members of the association.

It is further prayed that the commissioner of banking and insurance and those assuming to act under his authority be restrained from continuing in possession of the association and that it be decreed that the officers and directors of the association at the time it went into possession of the commissioner of banking and insurance have abandoned the association, and that their offices are vacant.

The complainant further prays that a trustee or trustees be appointed to take over the assets of the association and to turn over to the officers and directors who may be elected by the association the assets and effects of the association. There is included a prayer for a temporary injunction restraining the defendants from interfering with such trustee or trustees' possession if so appointed by the court.

It is further prayed that such trustee or trustees be directed to examine into the affairs of the defendant association both prior to and during the possession of the commissioner of banking and insurance to ascertain whether the affairs of the association have been conducted according to law, and other relief was prayed for.

The bill was supported by a number of affidavits. On the filing of the bill, the defendants were directed to show cause why a preliminary injunction should not issue and why a trustee should not be appointed to take over the assets of the association and be authorized to make the investigations and institute the actions as prayed for in the bill of complaint.

The defendants Carl K. Withers, Ernest A. Minier, Andrew Thomson, and Louis J. Cohen gave notice that on the return day of the said order to show cause they would move to dismiss the bill of complaint for a variety of reasons, among them being that the court had no jurisdiction; that the bill of complaint does not exhibit nor does it allege a civil suit wholly between citizens of different states, nor a civil suit of any nature. They said that the bill should be dismissed on the further grounds that it was multifarious and the prayers contained therein could not be granted upon a single bill. They objected that it was not within the power of this court or in the exercise of its sound discretion to interfere where the complainant might obtain full, complete, and adequate relief under the provisions of the statutes of New Jersey or where the action of this court would interfere with state officials in the performance of the duties imposed upon them by the statutes of the state of New Jersey in pursuance of the public policy of that state. And they asked for the dismissal of the bill on a number of other grounds.

On the return day of the rule, answering affidavits were filed by the defendants and further affidavits were filed by both parties on and after that date.

The charges of the complainant simmer down to these: (1) That Carl K. Withers, the commissioner of banking and insurance, has not properly administered the affairs of the Roselle Park Building & Loan Association because (a) he or his agents employed a Newark realtor to make appraisals at a cost of $6,292, which was excessive; (b) the same realtor was given the insurance business and the exclusive management of the real estate; (c) the maintenance and repair work of the association was concentrated in one firm, namely, Whitney & Co., of Newark, which charged excessive prices; (d) that the commissioner or his predecessor, or both, allowed counsel fees to Louis J. Cohen as attorney without the approval of the Court of Chancery of New Jersey as required, as he alleges, under the New Jersey building and loan laws, which fees were excessive; and (2) that the commissioner permitted a recapture of undivided dividends to be effected in such a manner that it resulted in charging a disproportionate share of loss to holders of installment shares and excepted income shares from such loss.

In any event, the above-enumerated complaints raise sufficient issues to permit disposition of the cause by the court without requiring consideration of the numerous

further and other incidental charges and counter charges.

Within the comparatively recent past, Judge Fake of this court, had before him an application in which citizens of another state sought to have a receiver appointed for a building and loan association which had been taken into the possession of the commissioner of banking and insurance of New Jersey. In that case, Fulia et al. v. Warranty Building & Loan Association of Newark, N. J., et al. (D.C.) 5 F.Supp. 952, the court concluded to refuse to appoint a receiver while in such possession, saying: "Shortly prior to the filing of the bill in this cause, the commissioner of banking and insurance took possession of the property and business of the defendant association pursuant to authority vested in him by the laws of the state. He has placed an officer in direct charge of its affairs, and in co-operation with the officers of the association an endeavor is being made to conserve the estate in the interests of all concerned. State legislation finding its authority in the police power, which is essentially an affair of the state, has been enacted for the purpose of meeting the acute situations with which loan associations have been confronted in the present crisis. This has resulted in the building up of an organization under the direction of the commissioner which, by reason of recent and past experience, affords a method of control and operation for loan associations with frozen assets, which is equally as efficient if not superior to those devices which have grown up in our equity jurisprudence. To interrupt the lawful and conservative efforts of the commissioner in this case presents a very serious problem, and this court will not exercise its powers to such an end unless it is made to appear that the estate and the interest of the individuals therein will be better protected by such action." Fulia v. Warranty Building & Loan Ass'n of Newark, N. J., et al. (D.C.) 5 F.Supp. 952.

Since that time the United States Supreme Court has fully approved Judge Fake's theory, as above enunciated, when it had before it a series of cases involving the question of comity between the federal courts and the state administration of corporate assets by a state agency. The basic case of this series was Pennsylvania v. Williams et al., Receivers, 294 U.S. 176, 55 S.Ct. 380, 79 L.Ed. 841, 96 A.L.R. 1166. This was likewise a contest to determine whether the affairs of a building and loan association in financial difficulty should be administered by the federal court or by the department of banking of the commonwealth of Pennsylvania, under the statutes of that commonwealth providing for the regulation and supervision of financial institutions, including building and loan associations. Mr. Justice Stone in that case said, 294 U.S. 176, at page 183, 55 S.Ct. 380, 384, 79 L.Ed. 841, 96 A.L.R. 1166:

"The question is not the ordinary one of comity between a federal and a state court, each asserting jurisdiction over the same subject-matter and the same property and where there are shown no special reasons addressed to the discretion of the court first acquiring jurisdiction for relinquishing its jurisdiction in favor of the other. Compare McClellan v. Carland, 217 U.S. 268, 281, 282, 30 S.Ct. 501, 54 L.Ed. 762; Hyde v. Stone, 20 How. 170, 175, 15 L.Ed. 874; Chicot County v. Sherwood, 148 U.S. 529, 534, 13 S.Ct. 695, 37 L.Ed. 546; In re Chetwood, 165 U.S. 443, 460, 17 S.Ct. 385, 41 L.Ed. 782, with Harkin v. Brundage, supra [276 U.S. 36, 48 S.Ct. 268, 72 L.Ed. 457]; Rogers v. Guaranty Trust Co., 288 U.S. 123, 53 S.Ct. 295, 77 L.Ed. 652, 89 A.L.R. 720; Kansas City Pipe Line Co. v. Fidelity Title & Trust Co., 217 F. 187 (C.C.A.8th); First National Bank of Memphis v. Horuff, 65 F.(2d) 318 (C.C.A.5th). Here no state court is asserting jurisdiction, but the state officer, charged by the statutes of the state with the duty of supervising its own building and loan associations and of liquidating them by an adequate procedure when insolvent, asks to proceed with the liquidation. See Amos v. Trust Co. of Florida, 54 F.(2d) 286, 288 (C.C.A.5th).

"A court of equity, which in its discretion may refuse to protect private rights when the exercise of its jurisdiction would be prejudicial to the public interest, see United States ex rel. Greathouse v. Dern, 289 U.S. 352, 359, 360, 53 S.Ct. 614, 77 L.Ed. 1250, or deny relief upon performance of a condition which will safeguard the public interest and secure substantial justice to the complainant, see City of Harrisonville v. W. S. Dickey Clay Mfg. Co., 289 U.S. 334, 338, 53 S.Ct. 602, 77 L.Ed. 1208, would seem bound to stay its hand in the public interest, where it reasonably appears that the private right will not suffer. It is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful

independence of state governments in carrying out their domestic policy. Fenner v. Boykin, 271 U.S. 240, 243, 244, 46 S.Ct. 492, 70 L.Ed. 927; Massachusetts State Grange v. Benton, 272 U.S. 525, 527, 47 S.Ct. 189, 71 L.Ed. 387; Matthews v. Rodgers, 284 U.S. 521, 525, 52 S.Ct. 217, 76 L.Ed. 447. Cf. Central Kentucky Natural Gas Co. v. Railroad Commission of Kentucky, 290 U. S. 264, 273, 54 S.Ct. 154, 78 L.Ed. 307. It has long been accepted practice for the federal courts to relinquish their jurisdiction in favor of the state courts, where its exercise would involve control of or interference with the internal affairs of a domestic corporation of the state. See Rogers v. Guaranty Trust Co., supra, 288 U.S. 123, 130, 131, 53 S.Ct. 295, 77 L.Ed. 652, 89 A.L.R. 720. Compare Burnrite Coal Briquette Co. v. Riggs, supra, 274 U.S. 208, 212, 213, 47 S.Ct. 578, 71 L.Ed. 1002; Canada Malting Co. v. Paterson Steamships, Ltd., 285 U.S. 413, 419–423, 52 S.Ct. 413, 76 L.Ed. 837; Langnes v. Green, 282 U.S. 531, 541, 51 S.Ct. 243, 75 L.Ed. 520. There are stronger reasons for adopting a like practice where the exercise of jurisdiction involves an unnecessary interference by injunction with the lawful action of state officers. Matthews v. Rodgers, supra, 284 U.S. 521, 525, 52 S.Ct. 217, 76 L.Ed. 447.

"Here, upon presentation of the application for appointment of receivers, which would involve such an interference, the District Judge might appropriately have required notice of the application to be given to the state officers. It was his duty to do so if satisfied that the delay involved in adopting that course would not result in the sacrifice of any vital interest of the insolvent corporation, its creditors or its stockholders.

"On the showing that their interests would be adequately protected by liquidation under the direction of the secretary of banking, the District Judge should have denied the application for the appointment of receivers, or, if he had already appointed them, should have discharged the receivers, and directed the surrender of the property in their possession to the secretary in order that the liquidation might proceed under the state statutes.

"That course should be pursued now." [1]

Then followed the decision of the Supreme Court in the case of Gordon, Secretary of Banking, et al. v. Washington et al., 295 U.S. 30, 55 S.Ct. 584, 589, 79 L.Ed. 1282, wherein the reasoning of Pennsylvania v. Williams, supra, was applied, and the same learned justice used the following language: "We have recently had occasion to point out that a federal court, even in the exercise of an equity jurisdiction not otherwise inappropriate, should not appoint a receiver to displace the possession of a state officer lawfully administering property for the benefit of interested parties, except where it appears that the procedure afforded by state law is inadequate or that it will not be diligently and honestly followed."

The complainant here avers that he comes without the rule laid down by the Supreme Court in that his complaint is founded on allegations charging that the state officer is not lawfully administering the property of the interested parties for their benefit, and that the state law is not being diligently and honestly followed.

This brings us to a consideration of the proofs in connection with such of the allegations as are necessary for the determination of the main issues raised.

It appears that in July, 1934, Mr. Harwood Fish, Sr., secretary of the Roselle Park Building & Loan Association, conferred with Mr. Minier, deputy commissioner of banking and insurance and personally in charge of the building and loan bureau of that department. At that time there was considerable concern for the affairs of the association, particularly in connection with a government loan obtained by the association. There followed other conferences which led up to a contemplated meeting of the directors of the association set for September 6, 1934. On September 4th, however, Mr. Harwood Fish, Sr., committed suicide, and a special meeting of the board of directors of the association was called for the afternoon of that day, resulting in the passage of a resolution requesting that the commissioner take possession of the association. Andrew Thomson, a department examiner, was designated as special assistant deputy commissioner to take the formal and actual possession of this association, which was accomplished on September 8, 1934. Mr. Minier kept

---

[1] See, also, Gordon, Secretary of Banking of Pennsylvania, v. Ominsky et al., Receivers, 294 U.S. 186, 55 S.Ct. 391, 79 L.Ed. 848; Penn General Casualty Company v. Pennsylvania ex rel. Schnader, Attorney General, 294 U.S. 189, 55 S.Ct. 386, 79 L.Ed. 850.

in contact with the affairs of the association and Louis J. Cohen, who was an assistant Attorney General assigned to the department of banking and insurance, was named by the then Commissioner Kelly as counsel. The affairs of the association were naturally disturbed and required prompt and expeditious care in the unraveling of the complicated situations, as would be naturally attendant in such a crisis in the affairs of so large an organization.

The physical management of the real estate was immediately placed in the charge of David Cronheim, mentioned in the bill of complaint. He operated a real estate office in Newark, N. J., that covered considerable territory in the northern part of the state. He had a large organization and at the time of his appointment to the affairs of this association, as aforesaid, he was managing 500 units of real estate in Union county. He made appraisals of all the real estate owned by, and mortgaged to, the association, and was paid, as charged by the complainant, the sum of $6,292. For this sum he made a personal inspection of every piece of real estate in which the association was so interested. Reports were in duplicate, and each appraisal contained a photograph of the premises, the location, size of the plot, size of the building, condition of the building, condition of the neighborhood and assessed value obtained from various authorities, plus other information of interest and value. The result of this research filled three bound volumes. These appraisals covered some 600 units. The cost appears not to be shocking. Mr. Cronheim seems to have been capable of installing forthwith an organization of trained workers having the ability to cope with the situation, necessitating the uninterrupted collection of rents, survey of insurance, review of assessed valuations looking toward reduction in tax assessments and other services particularly essential to this association at the time it was taken into possession. Complainant charges that Mr. Cronheim was a friend of Mr. Minier, of many years' standing. I can find no indication of inefficiency, corruption, or excessive charges upon the part of this employee.

Charges are likewise made that Whitney & Co. were given the management of maintenance and repair of the real estate of the association. The complainant rests his indictment of this firm on the charges of a painter named Isidore Borodowko, who says: "Some time in early February, 1935, I received a telephone call at my home and was informed by the person who called me that while they would like to give me work on properties owned by the Roselle Park Building & Loan Association, that my estimates for such work were entirely too low and that if I desired to procure any work in the future, I must submit estimates that were much higher. I asked who was speaking, but the person talking would not tell me who he was. After the telephone conversation was ended, I tried to trace the telephone call thru the telephone company, but could only find that the same was a call from Newark, New Jersey.

"After the said telephone conversation, I received orders from Whitney & Company of Newark, Essex County, New Jersey, who I had been informed by the said Andrew Thomson and Hjalamar Larsen were in sole control of the repairs and maintenance of the property of the said association and one of the jobs which I received was for the said work at 38 Ashwood Avenue, Kenilworth, Union County, New Jersey, with reference to which I submitted an estimate to the said Hjalamar Larsen about November 3rd, 1934.

"Before submitting a bill for said work and because of said phone call, I called at Whitney Company's office in the City of Newark and there saw Fred Becker and asked him what I should charge and he told me to charge for the Ashwood Avenue job $15.00 per room or more 'but not much more,' plus coal.

"I thereupon submitted a bill to the Whitney Company in the sum of $131.75 on March 5, 1935 and received full payment therefor from the Whitney Company, and the said Whitney Company submitted a bill to the said association for the said work in the sum of $158.87 on March 31st, 1935, which said bill was paid by the Commissioner of Banking and Insurance. I was willing to do this work for the sum of $90.00, in accordance with my said estimate and would have made a profit if paid such price. My bid was based upon a price of $9.00 a room plus coal."

The charges of Mr. Borodowko are emphatically denied by Whitney & Co. Whitney & Co. were employed to oversee maintenance and repair work and were given a fee based on a percentage of the cost of such work. There is no reason why the court should substitute its judgment for that

of the commissioner in resorting to this system in the absence of any definite showing of bad faith in so doing. The affidavit of Mr. Borodowko is not too convincing because he admits that he acquiesced, without the slightest remonstrance, in padding his own bills and accepting unearned moneys even though he himself, together with his family, were members of the association. His charges are based on an anonymous telephone call and stand catagorically denied by responsible officers of Whitney Company. I feel that this charge also falls short of a showing that the state agency had failed to protect the interests of the association.

■ Another charge is made that the legal work incident to the operation of the affairs of the association was turned over to Louis J. Cohen, who received substantial fees upon the approval of former Commissioner Kelly. It at least will be conceded, I think, by all parties that Mr. Cohen had large experience in connection with the legal work of building and loan associations. On September 8, 1934, he accepted appointment as counsel in charge of the legal affairs of the association. After examining into the affairs concerned with the unhappy death of Mr. Harwood Fish, Sr., he found that Mr. Fish had been permitted to acquire title to 86 properties, either from mortgagors in distress or directly from the association after foreclosure. Some of these properties were taken in his own name and others were in the name of a corporation owned by Mr. Fish and known as the Uco Realty Corporation. These conveyances had been made by the association without any cash or valuable consideration except that a bond and mortgage was executed either by Mr. Fish or the Uco Realty Corporation in each case. Mr. Cohen set about to repossess the association of these 86 properties and 83 deeds were prepared so that title to each of the properties was revested in the association. He was paid $8,-300, or at the rate of $100 per title. He performed other legal services in the way of foreclosure suits, dispossess actions, ejectment actions, suits to recover rent and deficiency proceedings. His fees in these matters, exclusive of the sum of $8,300, paid in connection with the reconveyances by the Fish estate or the Uco Realty Corporation, have amounted to the sum of $12,-000.

That these amounts were substantial allowances cannot be denied. That Mr. Cohen at the same time was a salaried officer of the state is also true. But the legal services were large in bulk. It appears that all of the resources of Mr. Cohen's private law firm were brought in to the accomplishment of the requirements of the association. There is indication that the former commissioner's allowances to Mr. Cohen were only partial. Very often the question of allowances to counsel becomes extremely difficult. The lawyer should be fairly compensated and at the same time great care must be taken not to cross the boundary of fair compensation into the realm of abandoned generosity, especially where "other people's money" is concerned.

From the showing made, I cannot say that the fees involved were shockingly unreasonable.

Aside from the question of the reasonableness of these charges, the complainant has raised the proposition that they were, in any event, illegally paid in view of the New Jersey law governing the administration of associations in the possession of the department. The pertinent statute is as follows: "And the compensation of the special assistant deputy commissioner, counsel and other employees and assistants, and all expenses of administration and liquidation, shall be fixed by the commissioner, subject to the approval of the Court of Chancery on notice to such association, and shall upon the certificate of the commissioner be paid out of the funds of such association in the hands of the commissioner." P.L.1933, c. 36 (N.J.St.Annual 1933, 27—R(59).

It will be readily recognized that a strict compliance with the wording of this statute would mean that every expense of the administration of an association in possession would be subject to the scrutiny of the Court of Chancery, no matter how small the outlay might be, and this offers a situation which might become very impractical. Such a strict compliance with the statute would mean that not only would it be necessary to secure approval of the Court of Chancery upon notice to the association, before paying Mr. Cohen, but similar action would have to be taken before negotiations for the purchase of a dozen pencils, a bottle of ink or other minor items. However, it appears to have been the clear intent that there should be some check upon the allowances for fees and expenditures of money which ultimately come out of the treasury of a building and loan association. It is plain to see that the Legislature of

New Jersey felt that the shareholders or owners of an association, should have an opportunity at least to voice an objection against outlays of the moneys of an association, and it seems evident to the court that this procedure, cumbersome as it may be at the present time, is the law. He should either follow it or else the statute should be so modified as to give him a leeway in the expenditure of moneys within a certain maximum amount so as to cover nominal and usual expenses of administration, and that items exceeding such maximum amount should be brought before some approving authority as indicated in the present statute.

█ The complainant himself has argued that the court may take judicial notice of the fact that the records of the Court of Chancery will disclose no instance wherein there has been a compliance with the statute. The court is inclined to feel that the provisions thereof have been overlooked rather than that there has been an intentional malfeasance by the commissioner in this respect. Then, too, the fees paid to Mr. Cohen were with the approval of the former commissioner, Mr. Kelly. It may also well be that the association itself may have appropriate remedy in respect of allowances made contrary to the statute in another form. The court is not impressed that there has been a willful violation of this law upon the part of Commissioner Withers or his codefendants.

█ The final charge in this bill has to do with the method whereby losses have been proportioned among the members of the association. It is alleged that the commissioner has instituted a practice whereby undivided surplus has been applied to losses or to reserves in a manner that permitted members holding income and lapsed shares to escape loss, and that members holding installment and single payment shares were charged with losses.

In the case of Newark Twenty-One Building & Loan Association v. Zukerberg, 115 N.J.Eq. 579, 171 A. 804, 806, Vice Chancellor Stein seems to have ruled upon this objection adversely to the complainant's charge. He says:

"In resisting the motion to strike the answer, it was contended:

"(1) That complainant wrongfully calculated the withdrawal value of defendant's shares of stock because prepaid shareholders were not burdened with a proportionate share of losses; (2) that the orders of the commissioner of banking and insurance Nos. 1-A, 3, and 3-A, did not have the force and effect of law; and (3) that the action of the board of directors was unlawful.

"I. The prepaid shareholders paid full value for their shares, and were not given the right to participate in the profits of the association derived from premiums, fines, withdrawal penalties, and interest on the association's investments. The association agreed to pay such shareholders a fixed dividend in lieu of participation in the general profits of the association. P.L.1925, c. 65, § 74, Comp.St.Supp.1930, § 27—R(74), of an act regulating building and loan associations, sanctions such contract. It provides 'that agreements may be entered into by and between any such association and any of its members holding paid-up shares, as the constitution shall provide, whereby said members waive participation in the general profits of such association in consideration of a fixed profit on the paid-up shares.' The complainant in its constitution, article 3, section 4, provides for the issuance of prepaid shares and interest thereon at such rate as the directors may from time to time determine. The certificate issued by the association to its prepaid shareholders provides that such shares shall bear interest at 5 per cent., and may be called in and canceled at any time upon notice and payment of the par value and interest to the date of cancellation, and that beyond the payment of 5 per cent. interest such shareholders 'shall not further participate in the general earnings of the association.'

"The installment stockholders enjoy many possible advantages which are denied to the prepaid shareholders. They participate in all of the profits of the association, and this expedites the maturity of their stock and profitable winding up of their financial venture. The profits on their investment depend upon the time the association runs, while the holders of paid-up shares obtain their profits in stipulated interest as the time proceeds. In both instances it is a case of profit upon money invested in the stock of the association—the common fund which constitutes the capital of the association. They constitute, therefore, simply a different class of stockholders. Latimer v. Equitable Loan & Invest-

ment Co. (C.C.) 81 F. 776; Towle v. American Building & Loan Association (C.C.) 75 F. 938. That paid-up shareholders are a different kind of shareholder from that of the installment shareholder clearly appears in section 74 of the act of 1925, chapter 65, 'that no member shall hold paid-up shares in any such association of a value in excess of two per centum of the liability of such association for dues on installment shares, and in no case shall a member hold paid-up shares in any such association of a value in excess of twenty-five thousand dollars.' From this limitation, however, are excepted 'paid-up shares that are received by a person by will or under the statute of distribution, or held as collateral security.' No such limitation is imposed upon installment shareholders.

"The complainant association in the instant case, by authority of the statute and under its constitution, entered into agreement with its paid-up shareholders whereby these members waived participation in the general profits of the association in consideration of the payment of interest at the rate of 5 per cent. per annum. They had no interest in the profits set up on the books which were transferred to the reserve account."

The court has not overlooked the fact that complainant argues that the foregoing decision is affected by the amendment to the building and loan law of 1935, P.L.1935, c. 59 (N.J.St.Annual 1935, § 27—R (1) et seq.). I cannot, however, agree with this argument in the face of the fact that the income shares outstanding in this association in this case were of the very kind described by Vice Chancellor Stein and not in accordance with those authorized to be issued under the 1935 act.

In any event, the test here is not of the efficacy of the method used by the commissioner, but rather has he acted in good faith? Is he acting to protect this association? Does it appear that he has not diligently and honestly administered the property for the benefit of the interested parties?

Furthermore, this entire question (the application of recaptured dividends) cannot furnish in this suit the foundation for an equitable action enjoining the administration of the affairs of the association by the state agency created for that purpose.

The court must also note that no other of the 3500 members of this association has sought to voice an interest in these proceedings. This consideration should ordinarily play no part in a determination of the substantial legal rights of an individual complainant, but there was made in the argument of this cause an intimation, nay, more than an intimation, a definite statement that the commissioner was ready and willing to restore this association to its shareholders. Under the present-day economic conditions, it would seem all-important to this association that such occur. The complainant alleges that the willingness of the commissioner to restore the association to its owners has been prompted by the filing of this bill. In so far as the owners are concerned, it makes little difference what has inspired the action. The important objective to be accomplished is to have this association, never alleged to have been insolvent, once again riding the financial sea under its own power, with confidence restored in its owners and the necessary wheels of business revolving so that it may once more be a vessel of profit to its owners.

This will not be accomplished by extending the jurisdiction of this court to encompass the affairs of this association at this time, with the incidental appointments and expenses. None of the charges in the bill warrant such action.

Before concluding, the court adverts to a motion by counsel for complainant to suppress certain of defendants' affidavits. In view of the opportunity offered to complainant and his attorneys to place on file counter affidavits and the fact that advantage was fully taken of such right, it seems wiser to hold the record intact. Therefore, that motion will be denied.

The bill itself will be dismissed for the reason that there has not been a showing that this court should displace the possession of a state officer lawfully administering property for the benefit of interested parties where it has not appeared that the procedure afforded by the state law is inadequate, or that it will not be diligently and honestly followed.