HARRY J. STEINLEIN, complainant,

*v.*

PIONEER BUILDING AND LOAN ASSOCIATION, defendant.

[Decided September 10th, 1940.]

On bill, &c.

*Mr. John Warren,* for the complainant.

*Mr. Frank Long (Mr. Fred G. Stickel, Jr.),* for the defendant.

BIGELOW, V. C.

This is a bill to redeem. Complainant, September 6th, 1921, borrowed $6,000 from defendant Association on bond and mortgage and the collateral security of sixty shares of installment stock of the Association. It was an ordinary building and loan mortgage transaction.

In the winter of 1930 and again in December, 1932, complainant spoke to some officer of the Association about recasting the mortgage or paying it off, but nothing was said or done of a character to affect the legal or equitable rights of the parties. So no attention need be paid to these incidents.

On March 14th, 1933, the Commissioner of Banking and Insurance issued to defendant "Order Number one-A," directing defendant to set up on its books of account reserves according to a certain formula, and forbidding it from making

payments of the withdrawal or maturity value of shares, except trivial amounts to necessitous members. The size of the reserve required by the commissioner depended upon the book value of real estate held by the Association and the amount of mortgages on which interest was "excessively in arrears." The reserve calculated in accordance with the commissioner's order was $113,014.

On May 23d, the commissioner issued to defendant "Order Number three-A," directing that the reserve be raised from certain sources—first from reserves already created and unapportioned profits, then from profits previously apportioned, lastly from other specified sources. The old reserves and unapportioned profits of defendant amounted to $29,420 and the profits apportioned to $69,584. The directors of the Association at their regular meeting June 5th, 1933, took action toward compliance with the commissioner's order and resolved "that the Association, for the purpose of accumulating the required reserve, recapture from the installment shareholders said profits apportioned, amounting to $69,584.05, the same to be placed in the contingent reserve account." Observe that *all* profits apportioned were put into reserve. Although the reserve was $14,010 below the amount indicated by the formula, the commissioner on June 9th, 1933, accepted it as sufficient.

The commissioner also, on June 9th, 1933, revoked Order Number one-A so far as defendant was concerned and issued instead to defendant "Order number one." This order directed that not more than fifty per cent. of the dues paid in by any member shall be repaid on withdrawals or be applied as share credits upon the repayment of mortgage loans. Order three-A contained this provision, "The withdrawal value of shares determined after establishing required reserves as heretofore provided, which shares have been pledged as collateral security to a mortgage loan, may likewise be applied toward recasting of such mortgage loan." I am uncertain whether these orders had the effect of permitting defendant on and after June 9th, to apply the withdrawal value of shares toward repayment of a mortgage, but I will assume in favor of complainant, they had such effect.

Complainant has never paid anything on account of the principal debt but he regularly paid interest and installment dues until and including May 6th, 1933. The dues paid amounted to $4,230 and the dividends apportioned to his shares, $1,575.78, total $5,805.78. The by-laws at that time in effect gave to complainant's shares a withdrawal value equal to book value.

Complainant after spending the winter in Florida, returned home in May, 1933, and appeared at a meeting of defendant's directors—probably the June 5th meeting—and told them he wanted to satisfy his mortgage by taking credit for $5,805.75, the withdrawal value of his shares, and by paying the balance $194.25 in cash. He was told that it had been necessary to erase the profits on all shares, that the value of his shares was only $4,230, that he would have to pay $1,770—and, I suppose, was also informed, that even the $4,230 credit would have to wait until the commissioner should approve the sufficiency of the reserve which the directors were setting up. From time to time after the June meeting, complainant discussed the matter with one or other of the Association officers, but was never willing to settle on the basis that the profits on his shares had been validly recaptured. And the officers of the Association have always insisted that their action was proper—and on that basis have been carrying on the Association's business since 1933.

Complainant contends that any reserve required to meet actual or anticipated losses, should have been created by assessing all shareholders a percentage of the value of their shares, including in such value, not only amounts paid to the Association but also profits apportioned to the shares; that the method adopted by the Association was discriminatory, inequitable and unlawful.

The answer of the defendant repeatedly characterizes the profits of the Association which had been apportioned prior to March, 1933, as "unfixed, paper or tentative profits." The proofs show that these adjectives do not fit the facts.

\*        \*        \*        \*        \*        \*        \*

Perhaps, while the profits of the Association were real, the apportionments were tentative and contingent. Dividends

on the income stock, at five and one-half per cent. or six per cent. per annum, were paid semi-annually, June 1st and December 1st, and were declared by the directors, I suppose, in May and November. At the close of each fiscal year, the directors also declared upon the installment shares, a dividend, or apportioned a profit, to be placed to the credit of the shareholders. The rate for 1930 was four and one-half per cent. These dividends were calculated, not alone on the amount of dues paid to the Association, but on dues plus dividends previously declared. For this purpose at least no distinction was drawn between dues paid and profits apportioned—they equally were the capital investment of the shareholder. The only distinction made before the spring of 1933 was that on a premature withdrawal of shares, the member might forfeit a percentage of his apportioned profits, dependent upon the age of his shares, but he never forfeited any of his dues paid to the Association.

Let us now examine the operation by which the reserve was set up in June, 1933. There were outstanding:

| | | |
|---|---|---|
| Income shares | | $293,300 |
| Installment shares—dues | $469,321 | |
| Profits apportioned | 69,584 | |
| | | 538,905 |
| | | $832,205 |

The reserve set aside, $69,584, was taken wholly from the installment members, none from the paid-up shareholders. It took twelve and nine-tenths per cent. of the former's interest in the Association, nothing from the latter. But the inequality goes further. Among the installment members, those whose shares were the oldest, lost the most; the newer shares, to which few dividends had been added, lost little. Complainant had twenty-seven per cent. of his share value cancelled; Cronin, who took out his shares in 1930, suffered a six per cent. loss.

If the problem presented by this case were new and if complainant had acted promptly, I might agree with his contention. But defendant is able to cite two decisions that go far

toward upholding the method which defendant pursued in setting up the reserve. *Thirteenth Ward Building and Loan* v. *Weissberg, 115 N. J. Eq. 487; 170 Atl. Rep. 662; Newark Twenty-one Building and Loan* v. *Zuckerberg, 115 N. J. Eq. 579; 171 Atl. Rep. 804*. Complainant seeks to distinguish the instant suit on slight variations in fact but unsuccessfully, in my opinion.

An even greater obstacle confronts complainant. When the directors, June 5th, 1933, set up the reserve, he immediately knew of it. Indeed, I am satisfied that some weeks in advance he knew the action was contemplated and would be taken as soon as necessary calculations could be made. He grumbled, he stopped paying dues or interest on his debt but took no action until he instituted this suit November 28th, 1936. Even the prosecution of his suit has been dilatory; replication five months overdue; complainant's brief on final hearing submitted fifteen months after the testimony was closed. Meanwhile, the Association has been conducting its business on the basis established in June, 1933—new shares have been issued, new loans made, shares have been paid on maturity or on withdrawal, loans satisfied. It is too late to make any general alteration of the 1933 reserve account, and it would be unjust to allow a special alteration in favor of complainant alone. Complainant should have acted immediately, either to enjoin the Association from carrying into effect the resolution of June 5th, or to obtain a judicial determination of the amount required to cancel his mortgage. His laches bar his attack on the reserve. *Lazear* v. *American Steel Foundries, 86 N. J. Eq. 21, 642; 86 N. J. Eq. 252; 100 Atl. Rep. 1030*. There is due on complainant's mortgage the entire sum borrowed, $6,000, with interest at six per cent. from May 6th, 1933. *Contra* should be allowed the withdrawal value of the pledged shares, namely, dues paid $4,230, and (as I recall) one-half the profits apportioned thereto since June, 1933. The Association waives fines. Complainant may redeem on this basis. Counsel should be able to agree on the calculation.