UNITED STATES v. NATIONAL CITY
LINES, Inc., et al.

Cr. No. 19270.

District Court, S. D. California,
Central Division.

Aug. 14, 1947.

See also 7 F.R.D. 456.

Tom C. Clark, Atty. Gen., Wendell Berge, Asst. Atty. Gen., William C. Dixon, Robert L. Rubin, and James E. Kilday, Sp. Assts. to Atty. Gen., Jesse R. O'Malley, Sp. Atty., of Cincinnati, Ohio, Leonard M. Bessman, Sp. Atty., of Milwaukee, Wis., and James M. Carter, U. S. Atty., of Los Angeles, Cal., for the Government.

Hodges, Reavis, Pantaleoni & Downey, of New York City, and O'Melveny & Myers, Louis W. Myers, Pierce Works, and Jackson W. Chance, all of Los Angeles, Cal., for defendants National City Lines, Inc., American City Lines, Inc., Pacific City Lines, Inc., E. Roy Fitzgerald, and Foster G. Beamsley.

Joseph Thomas, of Akron, Ohio, and Haight, Trippet & Syvertson, Oscar A. Trippet, and Frank B. Yoakum, Jr., all of all of Los Angeles, Cal., for defendants Firestone Tire & Rubber Co. and L. R. Jackson.

Cosgrove, Clayton, Cramer & Diether, T. B. Cosgrove, and Leonard A. Diether, all of Los Angeles, Cal., for defendant General Motors Corporation.

Finlayson, Bennett & Morrow and H. T. Morrow, all of Los Angeles, Cal., for defendant Phillips Petroleum Co.

Wright & Millikan and Charles E. Millikan, all of Los Angeles, Cal., for defendant Mack Mfg. Corporation.

Lawler, Felix & Hall and John M. Hall, all of Los Angeles, Cal., for defendants Standard Oil Corporation of California, Federal Engineering Corporation, and Henry C. Judd.

YANKWICH, District Judge.

The defendants, indicted for violation of the Sherman Anti-Trust Law, 15 U.S.C.A. §§ 1–7, 15 note, have moved to transfer the proceeding to another district under the provision of the Federal Criminal Rules of Procedure, 18 U.S.C.A. following section 687, which reads:

"The court upon motion of the defendant shall transfer the proceeding as to him to another district or division, if it appears from the indictment or information or from a bill of particulars that the offense was committed in more than one district or division and if the court is satisfied that in the interest of justice the proceeding should be transferred to another district or division in which the commission of the offense is charged."[1]

### I.

### The Practice Which Led to the Change.

■ This provision is an innovation in federal criminal procedure. Up to the time of its enactment, when an offense was committed in more than one district, the Government had the choice of the district for prosecution.

The Constitution provides that the trial of a criminal offense shall be held in the state where the offense was committed.[2] The Bill of Rights guarantees trial in the state and *district* wherein the crime was committed.[3] Under the Constitution, the Congress is given the right to designate the actual place of trial when the offense is not committed within any state.[4] Because, under the conspiracy statute[5] a conspiracy can be prosecuted in any state or district in which an overt act is committed, the practice developed of choosing a preferred district. The choice was that of the Government. And, although the courts, at times, pointed out the unfairness of the procedure, the defendant was helpless in the matter. Well might the Supreme Court thunder, as it did in a well-known case, against the injustice of taking a California resident to be tried in the District of Columbia for conspiracy. But the practice continued. The words of Mr. Justice Brown ring true even today:

"But we do not wish to be understood as approving the practice of indicting citizens of distant states in the courts of this District, where an indictment will lie in the state of the domicil of such person, unless in exceptional cases, where the circumstances seem to demand that this course shall be taken. To require a citizen

---

[1] Sec. 21(b) Federal Rules of Criminal Procedure.

[2] United States Constitution, Article III, Sec. 2, Clause 3.

[3] Sixth Amendment, Constitution of the United States.

[4] United States Constitution, Article III, Sec. 2, Clause 3.

[5] 18 U.S.C.A. § 88.

to undertake a long journey across the continent to face his accusers, and to incur the expense of taking his witnesses, and of employing counsel in a distant city, involves a serious hardship, to which he ought not be subjected if the case can be tried in a court of his own jurisdiction."[6]

It was this practice, known to many of the members of the Advisory Committee, some of whom had been in Government service, which resulted in the adoption of this provision of the rules. Judge Learned Hand of the Second Circuit, during the proceedings of the Institute conducted before the New York University School of Law, in introducing a former Assistant Attorney General of the United States, who had been a member of the Advisory Committee, injected these witty remarks about the proclivity of prosecuting everything in the federal courts by conspiracy indictment:

"Before he begins * * * they used to speak of indictments when I was a district judge as if indictments were a sacred mystery. Everything was prosecuted by conspiracy. In the Federal courts, as you know, there are practically no other crimes than the use of mails to defraud and that is a conspiracy. You never found what the conspiracy—that was a part of the conspiracy—God himself never knew."[7]

And before the same Institute, the late Judge George Z. Medalie of the Court of Appeals of New York, who had been United States Attorney for the Southern District of New York, and was also a member of the Advisory Committee, stated in very forceful language, the injustice of the rule which permitted the Government to hail defendants in a conspiracy case before tribunals far removed from the place of their residence where the conspiracy, if any existed, was hatched:

"Think of what else we have done. It is really a scandal in the Federal Administration, *the frequent robbing of the Southern District of New York of its rightful jurisdiction.* All large scale financial or business crimes are committed in the Southern District of New York, and they ought to be tried elsewhere; and I feel as you would have with me, if you had preceded me in office—you take these anti-trust cases and other cases involving business operations where indictments are found by the government—a man is blissfully attending to his business in Chicago, committing this, that or the other crime, or doing this, that or the other good deed, depending on his outlook; and he finds he must go down somewhere in New Mexico, because since his business is nationwide, you can pick out any jurisdiction in the country and indict him there.

"Now that is pretty shabby business for the great government of the United States to indulge in. It ought not to be done. So we have another change of venue rule, that if it appears from the indictment or the bill of particulars that the crime has been committed or claimed to have been committed in more than one district, the judge in the district where the indictment has been found can order—and I am sure judges are fair and are not looking for these extra jobs—the trial in the district where it is most convenient that the case be tried.

"If, for example, *a business' headquarters are in Chicago, everybody is there, every book and record is there, practically every witness is there on both sides, then try it in Chicago. That is the decent thing to do and accords better with the dignity of our great government that it be done that way, rather than the shabby devices indulged in where we lose our status and our self-respect.* Government attorneys cannot, if they appraise themselves properly, afford to engage in that kind of thing, and perhaps it will diminish the abuse, if in fact, it doesn't succeed in its complete abolition."[8] (Emphasis added)

Others, who like Judge Medalie, had also been in the Government service, have expressed themselves as forcefully.[9] One of

---

[6] Hyde v. Shine, 1905, 199 U.S. 62, 78, 25 S.Ct. 760, 762, 50 L.Ed. 90.

[7] Federal Rules of Criminal Procedure, New York Institute, 1946, p. 160.

[8] Federal Rules of Criminal Procedure, New York Institute, 1946, pp. 274, 275.

[9] See the Remarks of G. Aaron Youngquist, another member of the Advisory Committee, and a former Assistant At-

the members of the Advisory Committee has made the charge that the practice makes it possible "for the Government to shop around for an unduly favorable locality and judge."[10]

Judge Alexander Holtzoff, who was the Secretary of the Committee, in his most recent commentary on the rules has said about this rule that

*"It creates a certain degree of equality between prosecution and defense in the choice of place of trial."*[11] (Emphasis added)

In my own commentary on the new rules, I stressed the importance of this departure and pointed to the hardships, inconvenience and injustice resulting, at times, from the present practice.[12]

As the new rule is the sole authority for removal from one district to another,[13] its scope must be determined from its language and the considerations which led to its enactment. In lodging the discretion in the trial judge, the Committee gave wide latitude to its exercise by stating that the transfer "shall be" granted when the judge is satisfied it is "in the interest of justice."[14] There is thus an element of obligatoriness in the provision ("shall") once a satisfactory showing is made. And the showing is subordinated to the condition that it convince the judge that the transfer is "in the interest of justice".

## II.

## What is "in the Interest of Justice"?

The phrase "in the interest of justice," like the analogous one which occurs often in statutory enactments, "in the furtherance of justice," has a broad meaning. It implies conditions which assist, or are in aid of or in the furtherance of, justice. Both call for the doing of things which bring about the type of justice which results when law is correctly applied and administered. They import the exercise of discretion which considers both the interests of the defendant and those of society. When commanded by a statute, they do not attempt to determine, in advance, the type of judicial action to be taken.[15] As said by the Supreme Court in a well-known case:

"The term 'discretion' denotes the absence of a hard and fast rule. The Styria v. Morgan, 186 U.S. 1, 9, 22 S.Ct. 731, 46 L.Ed. 1027. When invoked as a guide to judicial action it means a sound discretion, that is to say, a discretion exercised not arbitrarily or willfully, but with a regard to what is right and equitable under the circumstances and the law, and directed by

torney General, in Federal Rules of Criminal Procedure, New York Institute, 1946, pp. 169, 170. Wendell Berge, former head of the Anti-Trust Division of the Department of Justice, considered this change a "desirable" one. See, Wendell Berge, The Proposed Federal Rules of Criminal Procedure, 42 Michigan Law Review, 1943, pp. 353, 378, 379. For other comments, see Robert F. McGuire, Proposed New Federal Rules of Criminal Procedure, 1943, 23 Oregon Law Review, 65, 66; Judge Alexander Holtzoff, Reform of Federal Criminal Procedure, 1944, 3 F.R.D. 445, 452.

[10] Professor George H. Dession, New Federal Rules of Criminal Procedure, 1947, 56 Yale Law Journal, pp. 197, 225. Another writer on the subject has made the accusation that the Government in selecting the place for indictment in certain well-known cases, such as United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. Safeway Stores,

D.C.Kan.1943, 51 F.Supp. 448; Frankfort Distilleries v. United States, 10 Cir., 1944, 144 F.2d 824, chose "a tribunal foreign to the defendants who happen to be people of influence. It was calculated by the Government officials in those cases that the defendants would be at a disadvantage in the district chosen for trial." Wm. Scott Stewart, Federal Rules of Criminal Procedure, 1945, p. 190.

[11] See, Holtzoff, Federal Criminal Procedure, 37 Journal of Criminal Law and Criminology, 1946, pp. 109, 116.

[12] Yankwich, The New Federal Rules of Criminal Procedure, 1946, pp. 159, 192.

[13] See, Semel v. United States, 5 Cir., 1946, 158 F.2d 229, 231.

[14] Rule 21(b), Federal Rules of Criminal Procedure.

[15] Wells Fargo & Co. v. McCarthy, 1907, 5 Cal.App. 301, 318, 90 P. 203; People v. Disperati, 1909, 11 Cal.App. 469, 476, 105 P. 617.

the reason and conscience of the judge to a just result." [16]

So it is quite evident that, in each case, we are called upon to determine whether, under the particular circumstances of the case, a transfer would be in the interest of justice. The abuses which led to the adoption of the rule give us criteria by which to determine whether the discretion should or should not be exercised in a particular case. In my own commentary, I used the terms "hardship" and "inconvenience." [17] We are not without judicial sanction for taking these factors into consideration. Courts have held that the indictment of a person away from his domicile which requires him to (1) go to a distant place, (2) to employ counsel in a distant city and (3) to bring his witnesses from afar are hardships to be considered.[18] So is also, in the case of a corporate body, the fact that (4) its business headquarters are in another city, and (5) its records are there.[19]

There is also what Judge Medalie has called (6) "the robbing" of another district "of its rightful jurisdiction."

These considerations apply whether the defendant be poor or rich, a small or large corporation. Neither the rules nor our system would justify the elimination of any of these elements merely because the defendants, or some of them, may be persons of great wealth or corporations with large resources.

The new rules give as their purpose "to provide for the just determination of every criminal proceeding." And we are enjoined to construe the rules "to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay." [20]

So in this rule, also, we have an indication as to some of the elements—(7) fairness and (8) elimination of unjustifiable expense—to be considered in determining the meaning of the phrase "in the interest of justice." And the Supreme Court has recognized most of these elements, *fairness and the vexatiousness and oppressiveness of a trial away from the domicile of a defendant, whether he be an individual or a corporation,* as controlling in civil cases, the application of the doctrine of *forum non conveniens,* warranting a court in refusing to accept jurisdiction.

In a recent leading case on the subject,[21] Mr. Justice Douglas wrote for the court:

"We mention this phase of the matter to put the rule of *forum non conveniens* in proper perspective. It was designed as an 'instrument of justice'. Maintenance of a suit away from the domicile of the defendant—whether he be a corporation or an individual—might be *vexatious or oppressive.* An adventitious circumstance might land a case in one court when *in fairness* it should be tried in another." (Emphasis added)

### III.

#### The Facts Behind the Motion.

Because of the newness of the provision for transfer, there was need for clearing the ground legally before considering the facts upon which the motion is based.

---

[16] Langnes v. Green, 1931, 282 U.S. 531, 541, 51 S.Ct. 243, 247, 75 L.Ed. 520; see, Yankwich, Increasing Judicial Discretion in Criminal Proceedings, 1941, 1 F.R.D. 746.

[17] Yankwich, The New Federal Rules of Criminal Procedure, 1946, pp. 159, 192.

[18] Hyde v. Shine, 1905, 199 U.S. 62, 78, 25 S.Ct. 760, 50 L.Ed. 90. In Kiley v. Meckler, 1928, 57 N.D. 217, 220 N.W. 926, 928, the Court, in interpreting a state statute, allowing a change of venue, when (among other things) "the ends of justice would be promoted by the change," Comp.Laws N.D.1913, § 7418, subd. 3, says:

"There is nothing to show promotion 'of the ends of justice,' when practically all the witnesses live in Burleigh county and one other is adjacent to Burleigh county".

[19] See Remarks of Judge Medalie already quoted and to be found in Federal Rules of Criminal Procedure, New York Institute, p. 275.

[20] Rule 2, Federal Rules of Criminal Procedure.

[21] Williams v. Green Bay & W. R. Co., 1946, 326 U.S. 549, 550, 555, 66 S.Ct. 284, 287, 90 L.Ed. 311.

The motion made by the non-resident defendants in the case and joined in by Standard Oil Company of California, Federal Engineering Corporation and Henry C. Judd, seeks to transfer the proceeding to the United States District Court for the Northern District of Illinois, Eastern Division.

On April 9, 1947, the Grand Jury of this District returned an indictment against a group of corporations and individuals, charging two counts of violation of the Sherman Anti-Trust Law.[22] The indictment gives the States of the organization and the principal place of business of the corporations as follows:

The conspiracy charged in Count I of the Indictment is a conspiracy to acquire and monopolize transportation systems by the three transportation companies, National, American and Pacific, through the control of operating companies in a large number of cities, among them Baltimore, Maryland; Tampa, Florida; Mobile, Montgomery, Alabama; Beaumont, Port Arthur, El Paso, Texas; Aurora, Elgin, Bloomington, Normal, Champaign, Urbana, Danville, Decatur, East St. Louis, Joliet, Quincy, Illinois; Terre Haute, Indiana; Jackson, Kalamazoo, Pontiac, Saginaw, Michigan; Canton, Portsmouth, Ohio; Burlington, Cedar Rapids, Ottumwa, Iowa;

| Corporation | State of Organization | Principal Place of Business |
| --- | --- | --- |
| National City Lines, Inc. | Delaware | Chicago |
| American City Lines, Inc. | Delaware | Chicago |
| Pacific City Lines, Inc. | Delaware | Oakland |
| Standard Oil Company of California | Delaware | San Francisco |
| Federal Engineering Corp. | California | San Francisco |
| Phillips Petroleum Company | Delaware | Bartlesville, Oklahoma |
| General Motors Corporation | Delaware | Detroit, Mich. |
| Firestone Tire & Rubber Co. | Ohio | Akron, Ohio |
| Mack Manufacturing Corp. | Delaware | New York |

The individual defendants, with their address and the concern with which they are associated, are thus given in the indictment:

| Defendant | Address | Defendant Corporation with Which Associated |
| --- | --- | --- |
| E. Roy Fitzerald President and Director | Chicago, Ill. | National |
| Foster G. Beamsley, Vice Pres. and Director | Chicago, Ill. | National |
| H. C. Grossman, Asst. Secretary | Detroit, Mich. | General Motors |
| Henry C. Judd, Treasurer | San Francisco | Standard and Federal |
| L. R. Jackson Vice President | Akron, Ohio | Firestone |
| B. F. Stradley, Secretary-Treasurer | Bartlesville, Oklahoma | Phillips |
| A. M. Hughes, Vice-President and Director | Bartlesville, Oklahoma | Phillips |

[22] 15 U.S.C.A. §§ 1, 2.

400

Tulsa, Oklahoma; Lincoln, Nebraska; St. Louis, Missouri; Jackson, Mississippi; Salt Lake, Utah; Everett, Spokane, Washington; Sacramento, Eureka, Fresno, Glendale, Pasadena, San Jose, Stockton, Los Angeles, Oakland and Long Beach, California.

The manner of so doing and the position of the other companies, known as "supply companies" in the conspiracy, is stated in Count I of the Indictment in this manner: "knowingly and continuously engaged in a wrongful and unlawful combination and conspiracy to acquire or otherwise secure control of or acquire a substantial financial interest in a substantial part of the companies which provide local transportation service in the various cities, towns and counties of the several states of the United States, and to eliminate and exclude all competition in the sale of motor busses, petroleum products, tires and tubes to the local transportation companies owned or controlled by or in which National, American or Pacific had a substantial financial interest, and to local transportation companies in which said companies acquired or, in the future, acquire ownership, control or a substantial financial interest."

Towards this end certain of the defendants are charged with supplying money to the three transportation companies, to enable them to acquire control of these systems and, in return, entering into exclusive agreements to supply exclusively to the subsidiary operating companies certain equipment, petroleum products and other supplies and to eliminate other suppliers from the field.

Count II alleges substantially the same facts, but charges a violation of Section 2 of the Act. The nature of the violation is stated to be: "to monopolize part of the interstate trade and commerce of the United States, to wit, that part consisting of the sale of motor busses, petroleum products, tires and tubes used by local transportation systems in those cities, towns and counties in which defendants National, American and Pacific owned, controlled or had a substantial financial interest in, or acquired, or in the future, acquire, ownership, control or a substan-

tial financial interest in, said local transportation systems."

It is quite apparent from the indictment that "the head and front of the offending" is National City Lines, Inc., and its subsidiaries American City Lines, Inc., and Pacific City Lines, Inc., and especially National, which owns and controls the two others. National has its main place of business in Chicago, Illinois. All its records are located there. Two of its principal officers, whose legal residence is Chicago, have been indicted. Its thirty-four operating subsidiaries, which operate transportation systems in various cities, are operated and controlled from Chicago. The transactions, which form the basis of the two counts of the indictment, took place chiefly in Chicago. The agreements with the other defendants, which the Government charges had the unlawful monopolistic effect and which are the gist of the offense, were negotiated in Chicago over a long period of years. The trial of the action,—as appears from the affidavits of one of the defendants, E. Roy Fitzgerald, filed on his behalf and on behalf of his co-defendant, Foster G. Beamsley—would require the attendance over a period of months of some of its key men, including the two defendants named. This would result in a complete dislocation of its business at the place where it can least afford it—*at the central place of control.* The same conditions exist as to the other non-resident defendants, the suppliers, such as Firestone, General Motors, Mack and Phillips—that is, location of its chief business outside of the Southern District of California, non-residence of executive officers and men in managerial positions who are needed as witnesses, books and records kept outside the district, agreements entered into without the district and greater proximity to Chicago, Illinois, than to Los Angeles, California.

Standard Oil Company of California, Federal Engineering Corporation and Henry C. Judd feel that, although their main place of business is California,

"It is essential for the protection of Standard and Federal, as well as all other defendants, that the case be tried at a

location where the evidence to refute this conspiracy *may be produced with the least diminution or impairment.* Mr. Fitzgerald's affidavit shows that such location is Chicago." (Emphasis *theirs.*)

It is true, as the Government's affidavit asserts, that these companies, excepting Phillips, conduct certain operations in the State. That is, however, unimportant. The question to determine is whether, under the facts in the case, transfer is called for "in the interest of justice." And this can only be determined by considering the facts just alluded to in the light of the principles discussed in the first two portions of this opinion.

The facts, in the main, are undisputed. In truth, the Government, at first, did not deny the affidavit filed on behalf of National. Realizing, at the oral argument, that they may have treated the matter lightly, the Government sought and obtained leave to file a counter-affidavit. This counter-affidavit does not, on the whole, deny the facts relating to National and to the other non-resident defendants. In substance, it asserts that many of the Government witnesses are local and that, in the presentation of its case before the Grand Jury, it used many documents which were supplied locally. Granted that this is so, how can it be assumed, *in the face of sworn statements to the contrary,* that documentary and other proof to be presented by the defendants is available locally?

The factual situation which the Government presents to a grand jury is, of necessity, one-sided. Of the essence of the crime charged is criminal intent. Even the fairest presentation of a prosecutor's case may not show the real motivation of the acts being investigated. In this connection, I refer to the words of a great Judge[23]:

"I am aware of course that the word 'intent' as vaguely used in ordinary legal discussion means no more than knowledge at the time of the act that the consequences said to be intended will ensue. Even less than that will satisfy the general principle of civil and criminal liability. A man may have to pay damages, may be sent to prison, at common law might be hanged, if at the time of his act he knew facts from which common experience showed that the consequences would follow, whether he individually could foresee them or not. But, when words are used exactly, a deed is not done with intent to produce a consequence unless that consequence is the aim of the deed. It may be obvious, and obvious to the actor, that the consequence will follow, and he may be liable for it even if he regrets it, but he does not do the act with intent to produce it unless the aim to produce it is the proximate motive of the specific act, although there may be some deeper motive behind."

Acts and contemporaneous declarations of defendants, unrevealed by the Government's documentation, may change entirely the complexion of the case. And the Government is not in a position to say that it has its possession and can produce through witnesses and documentary evidence *locally available* all the facts bearing on the intent of the defendants. So that even if we assume that the Government does not need and will not produce outside witnesses or documents located outside of California, this *does not contradict* the sworn statements of the officers of the defendant companies that their defense will be grounded on the testimony of witnesses who will have to be taken away from their head offices and on documentary evidence and company records which will have to be transported to this district. *Firestone alone estimates that sixteen of its officers, executives or members of its managerial staff, residents of Akhron and Chicago, may be needed as witnesses in the case.*

The Government's affidavit lays much stress on the fact that the local operating subsidiary enjoys a measure of local control and that the largest restraint in the free flow of products resulted from the acquisition of the local transportation

---

[23] Holmes, J., in his dissent in Abrams v. United States, 1919, 250 U.S. 616, 626, 627, 40 S.Ct. 17, 21, 63 L.Ed. 1173.

system. The emphasis placed on the size of the Los Angeles transaction in the Government's affidavit and at the oral argument *does not* conform to the pattern of the indictment.

▆▆▆ Counsel for the Government seem to think that because the transportation system acquired in Los Angeles is the largest controlled by the system, venue is properly laid here. They insist that such acquisition was—as they put it at the oral argument—"the flowering of the conspiracy." But none of the operating subsidiaries in California, in or out of Los Angeles County, have been indicted. Nor are they designated as co-conspirators, as is sometimes done in cases of this character when the Government chooses to prosecute certain of the conspirators only. They are merely vehicles *through which the channeling of petroleum products, tires and other equipment* was achieved. The agreements by which this was accomplished were engineered by the defendants outside the district. Although one overt act is alleged to have occurred in the district, in a prosecution of this character, an overt act is not necessary.[24] The agreement is the essence of the offense.[25] And the proof of that agreement lies in the actions of the controlling companies—National and the large suppliers—who are charged to have agreed and conspired with them. The location of the operating companies to whom the products were supplied, as a result of this agreement, has nothing to do with the offense. Were the Government seeking—through a suit in equity,—to divest any of the defendant companies of their subsidiaries or to put an end to illegal agreements, the location of the business of the operating subsidiaries *might*

*have* some bearing on venue. Even then facts such as exist here would warrant the court in declining to take jurisdiction.[26] But in a case like the present one, a prosecution for criminal conspiracy to restrain and monopolize commerce, the location of the operating companies has no bearing whatsoever on the question of forum.

▆▆▆ Under the circumstances, I feel that the defendants have shown that the eight elements which, in the first portion of this opinion I indicated to be the criteria for determining whether a requested transfer would be in the interest of justice, exist in this case.

We have here a prosecution which would compel the chief defendants (1) to go to a place distant from the location of their business; (2) to employ or bring counsel to a distant city; (3) to bring witnesses from afar; (4) their business headquarters are in another city; (5) most of the records which relate to the transaction on which the indictment is based are there. Under the circumstances, (7) fairness would be absent and (8) the defendants would be put to unjustifiable expense, if we deprived the United States District Court for the Northern District of Illinois, Eastern Division, (6) "of its rightful jurisdiction."

*I do not question the motive of the Government in instituting the prosecution in this district.*

But I am satisfied that a trial here would impose unnecessary hardships on the defendants and entail unjustifiable expense which it is the object of the new rules of criminal procedure, and especially of the rule under discussion, to avoid. Altogether the facts spell out the vexatious-

---

24 Nash v. United States, 1913, 229 U. S. 373, 378, 33 S.Ct. 780, 57 L.Ed. 1232; United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 224, 225, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. New York Great Atlantic, etc., Co., 5 Cir., 1943, 137 F.2d 459, 464.

25 United States v. Trenton Potteries Co., 1926, 273 U.S. 392, 402, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989; United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 252, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. Gen-

eral Motors Corporation, 7 Cir., 1941, 121 F.2d 376, 404, 405.

26 Rogers v. Guaranty Trust Co., 1932, 288 U.S. 123, 130, 131, 53 S.Ct. 295, 77 L.Ed. 652, 89 A.L.R. 720; Williams v. Green Bay & W. R. R. Co., 1946, 326 U.S. 550, 555, 66 S.Ct. 284, 90 L.Ed. 311; Koster v. (American) Lumbermens Mutual Casualty Co., 1947, 67 S. Ct. 828, 91 L.Ed. ——; Gulf Oil Co. v. Gilbert, 1947, 67 S.Ct. 839, 91 L.Ed. ——, ——.

ness and oppressiveness which the Supreme Court has warned us to eschew in matters of this character.[27]

The motion of the defendants to transfer the cause to the Northern District of Illinois, Eastern Division, is, therefore, granted.

[27] See cases cited in Note 26 and the language of Mr. Justice Douglas already quoted from Williams v. Green Bay & W. R. R. Co., 1946, 326 U.S. 550, 555, 66 S.Ct. 284, 90 L.Ed. 311.